UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MOHAMED ELGHOURAB,

         Plaintiff,

                                  Case No. 17-CV-00911 (ARR)(ST)

  -against-


VISTA JFK, LLC,

         Defendant.


-----------------------------------------------------------------X


## DEFENDANT VISTA JFK, LLC'S POST-TRIAL BRIEF


**GORDON REES SCULLY MANSUKHANI, LLP**
ATTORNEYS FOR DEFENDANT VISTA JFK, LLC
ONE BATTERY PARK PLAZA, 28TH FL
NEW YORK, NEW YORK 10004
PHONE: (212) 269.5500
FAX:  (212) 269.5505

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

PRELIMINARY STATEMENT ...................................................................................... 1

SUMMARY OF TESTIMONY AND EVIDENCE ......................................................... 2

    (I)     Salma Berrones .................................................................................. 2

    (II)    Jorge Reyes ....................................................................................... 4

    (III)   Wilmann Borgella .............................................................................. 6

    (IV)  Alfonso Cristobal ............................................................................... 8

    (V)    Darin Miller ....................................................................................... 9

    (VI)  Plaintiff Mohamad Elghourab............................................................ 11

ARGUMENT .................................................................................................................. 14

    I.      Plaintiff's Overtime Claims Under the FLSA and NYLL Fail Because He was exempt under the Executive Emption ........................................... 14

          A.    Plaintiff Was Compensated on Salary Basis Above the Threshold Amount ..................................................................... 16

          B.    Plaintiff's Primary Duty Was Management of the Hotel's Kitchen ........ 16

                 (i)        the relative importance of the exempt duties as compared with other types of duties ................................... 18

                 (ii)       the amount of time spent performing exempt work........... 23

                 (iii)     the employee's relative freedom from direct supervision ........................................................................ 28

                 (iv)     the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. ................... 29

          C.    Plaintiff Directed the Work of Two or More Employees ........................ 30

          D.    Plaintiff Had Hiring Authority.................................................................. 31

    II.     Statutory Wage Notice Claim Under NYLL § 195(1)........................................... 32

CONCLUSION................................................................................................................. 33

## TABLE OF AUTHORITIES

**Cases**

*Alberti v. Cnty. of Nassau*,
    393 F. Supp. 2d 151 (E.D.N.Y. 2005) ....................................................................... 16

*Amash v. Home Depot U.S.A., Inc.*,
    No. 1:12-cv-837, 2014 U.S. Dist. LEXIS 79761
    (N.D.N.Y. June 12, 2014) ........................................................................................ 29

*Baldwin v. Trailer Inns, Inc.*,
    266 F.3d 1104 (9th Cir. 2001) ................................................................................. 26

*Clougher v. Home Depot U.S.A., Inc.*,
    696 F. Supp. 2d 285 (E.D.N.Y. 2010) ..................................................................... 15

*Donovan v. Burger King Corp.*,
    675 F.2d 516 (2d Cir. 1982) .......................................................................... 18, 19, 26

*Jackson v. Advance Auto Parts, Inc.*,
    362 F. Supp. 2d 1323 (N.D. Ga. 2005) ..................................................................... 18

*Krumholz v. Vill. of Northport*,
    873 F. Supp. 2d 481 (E.D.N.Y. 2012) ..................................................................... 15

*Martinez v. Hilton Hotels Corp.*,
    930 F. Supp. 2d 508 (S.D.N.Y. 2013) ................................................................. 14, 15

*Moore v. Tractor Supply Co.*,
    352 F. Supp. 2d 1268 (S.D. Fla. 2004) ..................................................................... 29

*Mullins v. City of N.Y.*,
    523 F. Supp. 2d 339 (S.D.N.Y. 2007) ..................................................................... 26

*Pippins v. KPMG, LLP*,
    759 F.3d 235 (2d Cir. 2014) ................................................................................... 15

*Ruggles v. Wellpoint, Inc.*,
    No. 08-CV-0201(LEK), 272 F.R.D. 320, 2011 U.S. Dist. LEXIS 17310
    (N.D.N.Y Feb. 22, 2011) ........................................................................................ 24

*Scott v. SSP Am., Inc.*,
    No. 09-CV-4399 (RRM)(VVP), 2011 U.S. Dist. LEXIS 32819
    (E.D.N.Y. Mar. 29, 2011) ............................................................................. 18, 19, 26

*Tamayo v. DHR Rest. Co., LLC*,
    No. 14-CV-9633 (GBD), 2017 US Dist LEXIS 18102 (S.D.N.Y. Feb 3, 2017) ...................... 18

*Yesmin v. Rite Aid of N.Y. Inc.,*
   No. 10-CV-4157(ERK)(RER), 2012 U.S. Dist. LEXIS 127655
   (E.D.N.Y. Sep 6, 2012) ........................................................................................ 17

**Statutes**

12 NYCRR § 142-2.14(c)(4)(i)(a-e) ................................................................... 15

29 U.S.C. § 201 ........................................................................................ 15, 17

29 U.S.C. § 207(a)(1) .................................................................................... 14

29 U.S.C. § 213(a)(1) .................................................................................... 15

N.Y. Lab. Law. § 651(5)(c) ............................................................................ 15

NYLL § 195(1) ............................................................................................. 32

NYLL § 195(1)(a) ......................................................................................... 32

NYLL § 198(1-b) .......................................................................................... 33

NYLL 195(1) ............................................................................................. 1, 2

**Regulations**

29 C.F.R. § 541.100(a) ................................................................................... 15

29 C.F.R. § 541.102 .......................................................................... 17, 18, 24

29 C.F.R. § 541.106(a) ................................................................................... 26

29 C.F.R. § 541.700(a) ............................................................................ 17, 18

29 C.F.R. § 541.700(b) ................................................................................... 24

29 C.F.R. 41.105 .......................................................................................... 31

29 C.F.R. 541.100(a)(3) ................................................................................. 30

29 C.F.R. 541.100(a)(4) ................................................................................. 31

Defendant Vista JFK, LLC ("Defendant" or "Vista JFK"), by and through its counsel, Gordon Rees Scully Mansukhani, LLP, hereby submits its Post-Trial Brief following the formal hearing held on May 21 and 22, 2019, in Brooklyn, New York, before the Honorable Allyne R. Ross, United States District Court Judge for the Eastern District of New York.

## **INTRODUCTION**

Plaintiff Mohamed Elghourab ("Plaintiff" or "Elghourab") brings this action for overtime wages allegedly owed to him under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") against Defendant. Plaintiff was employed as the Executive Chef of the restaurant located inside Defendant's hotel d/b/a Radisson at JFK (the "Hotel") from in or around September 2011 through in or around September 2016. In his Complaint, Plaintiff alleges that he worked between 70 and 84 hours each week, for five years, and was wrongfully denied overtime wages, in violation of the FLSA and NYLL. Additionally, Plaintiff brings a statutory claim for a wage notice violation under NYLL 195(1), alleging that Defendant failed to provide Plaintiff with a notice of his rate of pay.

## **PRELIMINARY STATEMENT**

The testimony and evidence adduced at trial clearly demonstrates that Plaintiff was an exempt executive and, therefore, not entitled to overtime compensation under the FLSA or NYLL. As Executive Chef, Plaintiff was in charge of the Hotel's kitchen, directed the work of all kitchen staff members, and, as part of the hotel management team, reported directly to the hotel's General Manager. Plaintiff's duties included, among other things, drafting the weekly schedule for employees and revising as needed, approving vacation and other leave requests, ordering the food and other supplies for the hotel, deciding what food would be served to hotel employees in the employee cafeteria, instructing and training employees on proper food preparation, taking

1

inventory, interviewing and hiring staff, verifying the accuracy of weekly payroll records, attending daily and weekly managers meetings, and ensuring that the kitchen was prepared to pass periodic health and brand inspections. During times when the restaurant was particularly busy, Plaintiff also assisted the staff with food preparation and service. However, at all times, Plaintiff, and nobody else, decided whom he would assist and how. Accordingly, because Plaintiff clearly falls under the definition of an exempt executive, his claims for overtime compensation under the FLSA and NYLL must fail.

Plaintiff's statutory wage notice violation should also be denied. Pursuant to NYLL 198(1-b), a complete affirmative defense to the wage notice claim asserted under NYLL 195(1) exists where an employer can prove that it made timely payment of all wages due to the employee. In the instant case, Plaintiff himself has admitted that his wages were always paid timely and were always in the full and correct amount owed to him. Accordingly, the defense is clearly applicable and this claim must also be denied.

## <u>SUMMARY OF TESTIMONY AND EVIDENCE</u>

### (I)     <u>Salma Berrones</u>

The first witness called to testify was Salma Berrones, the Hotel's Human Resources Manager. Berrones testified that Plaintiff was employed as the Hotel's Executive Chef from in or about September 2011 until in or about September 2016. (Trial Transcript, herein referred as "TR", at 9:23-25; 15:1-3). Berrones testified that, as Executive Chef, Plaintiff was a department head, and his duties were to oversee the Food and Beverage Department ("F&B Department"), including, among other things, supervising employees, ordering food, scheduling staff, processing payroll, attending meetings with other department heads, and doing whatever else was needed for the successful operation of the Department.  (TR at 66:10-67:12; 70:15-23). Specifically, with respect

to scheduling, Berrones testified that, each week, Plaintiff was responsible for writing the schedule for all kitchen staff, and accounting for any vacation, medical, personal, or other leave requests that may have been submitted.  (TR at 70:15-23). Additionally, Berrones testified that Plaintiff was responsible for scheduling staff to work banquets and other events.  (TR at 71:7-11. In addition to scheduling, Berrones testified that Plaintiff was responsible for reviewing leave requests submitted by kitchen staff, and either approving or denying those requests.  (TR at 71:22-71:24; 74:12-75:10); *see also* Defendant's Trial Exhibit NN.

Berrones also testified that, as Executive Chef, Plaintiff was responsible for verifying the payroll "punches" of all employees in his department.  (TR at 75:11-76:18). Specifically, Berrones testified that all kitchen employees were required to "punch in" and "punch out," and every week, a record of those punches was generated and given to Plaintiff to review.  (TR at 75:13-76:1). Berrones testified that, as a department head, Plaintiff was responsible for reviewing the punch reports to ensure that they accurately reflected the hours actually worked by the employees in his department.  (TR at 76:2-18). Moreover, Berrones testified that, throughout his employment, Plaintiff reviewed the punch reports for both the kitchen staff ("back of the house") and the restaurant staff ("front of the house").  (TR at 77:7-12).

Berrones next testified regarding Plaintiff's responsibilities with respect to hiring kitchen staff. Specifically, Berrones testified that, when a position became available in his department, Plaintiff would notify her of the vacancy and she would then contact the union so that they could send over candidates to be interviewed.  (TR at 78:3-79:1). Plaintiff would then meet with the candidates and, following the interview, he would inform Berrones whether he wanted to hire a particular candidate.  (TR at 78:3-11). To be sure, the Hotel is a union shop, which greatly reduces the frequency of employee turnover. Nonetheless, during Plaintiff's employment, two positions

became available in the kitchen, and Plaintiff was primarily responsible for interviewing and selecting candidates to fill those vacancies.  (TR at 78:3-78:10).  First, Berrones testified that Plaintiff interviewed and selected Jaiwante Singh for an available position as a dishwasher.  (TR at 79:16-80:11).  Second, Berrones testified that Plaintiff interviewed and selected Mohammad Hizam for a position as a substitute cook.  (TR at 96:6-15).  Berrones further testified that Singh and Hizam were the only two kitchen employees hired during Plaintiff's employment.  (TR at 96:14-22).

Berrones also elaborated on the Hotel's status as a union hotel.  In particular, Berrones testified that non-union employees are not permitted to perform the duties of union employees.  (TR at 81:16-22).  Berrones further testified that, if the union were to learn that a non-union employee was performing the work of a union employee, the union could file a claim seeking that a union employee be compensated for the work performed by a non-union employee.  (TR at 82:2-14).  For example, if a line cook claimed that the Executive Chef was cooking food, the line cook potentially could receive compensation for the time that the Executive Chef spent cooking.  (TR at 82:11-14).

Berrones further testified that, as Executive Chef, Plaintiff was responsible for ordering all of the food that was served in the hotel, including the food for the restaurant, the employee cafeteria, and any banquets or special events.  (TR at 91:22-92:22).  Berrones also testified that Plaintiff was responsible for deciding what food would be served in the employee cafeteria, and for determining what food would be prepared for the buffet that was offered when there was a down flight.  (TR at 93:13-19; 94:12-16).

**(II)     Jorge Reyes**

The second witness called by Plaintiff to testify was Jorge Reyes. Reyes testified that he

4

has been employed as a cook at the Hotel since in or about August 2000.  (TR at 152:5-7; 153:12-18).  During Plaintiff's employment, Reyes' regular schedule was Monday through Friday, 8:00 a.m. to 3:30 p.m.  (TR at 119:7-10; 121:2-23).  However, as the most senior cook in the kitchen, Reyes was the first employee to be offered overtime when available, and he frequently worked overtime during the years when Plaintiff served as Executive Chef.  (TR at 121:5-121:7; 125:15-20); *see also* Payroll Register for Jorge Reyes, Plaintiff's Trial Exhibits P7-P10.

Reyes testified that Plaintiff was his manager and regularly supervised his work.  (TR at 154:5-156:13).  In particular, Reyes testified that Plaintiff would instruct him which food to serve and in what manner.  (TR at 156:4-13).  Reyes also testified that Plaintiff was responsible for preparing the kitchen for periodic inspections, and that Plaintiff would instruct him what needed to be cleaned in preparation for those inspections.  (TR at 167:4-10).  Reyes further testified that his duties included preparing food for the restaurant kiosk/galley, and that Plaintiff would instruct him what sandwiches and salads to prepare for sale.  (TR at 172:15-22).

Reyes testified that, when he arrives to work in the morning, he spends approximately four hours preparing lunch for the employee cafeteria.  (TR at 131:22-25).  Reyes further stated that he performs this task by himself, without any assistance.  (TR at 132:1-5; 151:11-17).  Reyes stated that, from approximately 12:00 p.m. to 1:30 p.m., he would prepare the line for lunch and cook the lunch food.  (TR at 139:22-140:7.  Again, Reyes testified that he performed these tasks by himself without assistance.  (TR at 143:14-22).  Reyes further testified that, from approximately 1:30 pm until 3:00 pm, he would prepare salads and sandwiches to be served in the galley.  (TR at 141:6-11).  Additionally, when there was a down flight, Reyes testified that he would prepare the food to be served on the buffet, and again, that he performed this task himself without assistance.  (TR at 143:11-22.  However, Reyes did state that Plaintiff would occasionally help out when the

5

restaurant was busy by bringing trays of food out to the buffet line, bringing empty trays from the buffet back to the kitchen, bringing plates and utensils out to the buffet tables, and clearing plates from the tables of customers.  (TR at 149:5-20). Reyes further stated that down flights occurred approximately two to three times per week.  (TR at 172:25-173:1).

Reyes also testified that Plaintiff had an office that he would work out of almost every day. (TR at 154:17-22). Reyes testified that he observed Plaintiff working out of the office, and that Plaintiff would spend approximately two (2) hours per day in the office.  (TR at 154:18-155:1). Reyes further testified that Plaintiff was responsible for writing the weekly schedule for kitchen staff, and that he had observed Plaintiff in his office working on the schedule.  (TR at 156:20-156:21).

Reyes testified that Plaintiff was responsible for approving vacation requests for kitchen staff. Specifically, Reyes stated that, when submitting a vacation request, he was required to fill out a form that he then submitted to Plaintiff.  (TR at 166:5-14). When asked why he submitted the completed form to Plaintiff, Reyes responded that he did so because Plaintiff was the "kitchen manager."  (TR at 166:10-166:14).

**(III)** **Wilmann Borgella**

Wilmann Borgella testified that he began working at the Hotel as a cook in 2004 or 2005, and that he is a member of the union.  (TR at 182:15-24). Borgella testified that his weekly schedule is Tuesday through Friday from 4:00 p.m. to 11:30 p.m., and Saturday from 8:00 a.m. to 3:30 p.m. (TR at 183:10-12). He testified that, when he arrived at work at 4:00 p.m., he spent an hour prepping food and preparing to open the kitchen to serve dinner.  (TR at 225:4-11). He stated that, when he worked the dinner shift, there was always another cook working with him. (TR at 225:12-18.)

6

Borgella testified that, on Saturdays, he spent the first three and a half hours of his shift preparing lunch for the employee cafeteria.  (TR at 191:14-21). Borgella testified that he has always performed this task by himself and that nobody helped him prepare the employee lunch. (TR at 191:22-192:4). After he makes the employee lunch, Borgella testified that he then prepares to open the kitchen for lunch, which is served from 12:00 p.m. to 1:30 p.m.  (TR at 192:11-19; 195:18-19). After lunch, Borgella testified that he spends the remainder of his shift prepping the kitchen for the next cook.  (TR at 195:22-24).

Borgella testified that Plaintiff was his boss and that he reported to and was supervised by Plaintiff.  (TR at 222:3-223:16). He testified that Plaintiff would instruct him what to prepare for the employee lunch, but that Plaintiff would not actually help him prepare the staff lunch. (TR at 230:11-21). Similarly, Borgella testified that when there was a down flight and a lunch buffet was prepared, Plaintiff would instruct him what food to prepare for the buffet.  (TR at 195:1-17). Borgella also testified that Plaintiff instructed him on proper food presentation, and that, when new menu items were added, Plaintiff would instruct him how to prepare and present them.  (TR at 232:1-233:22). Borgella further testified that Plaintiff instructed him how to make the sandwiches and salads to be served in the restaurant galley.  (TR at 236:20-237:3). Borgella also testified that Plaintiff would ensure that the kitchen was prepared for inspections, and that Plaintiff would instruct Borgella and other staff what needed to be cleaned in preparation for those inspections. (TR at 229:16-230:5).

Borgella testified that he would occasionally work overtime, and that Plaintiff would be the one to offer him overtime. (TR at 224:5-16; 226:14-227:7). Borgella stated that Plaintiff also would approve vacation requests, which would then be sent to HR.  (TR at 228:3-9). In the event Borgella had to miss work because he was sick, he would call Plaintiff to inform him and, if he

could not reach him, would then contact the Hotel's front desk.  (TR at 228:13-228:19).

Finally, Borgella did admit that, when the restaurant was busy, Plaintiff would assist the kitchen staff with food preparation and other tasks. (TR at 204:14-17). Among other things, Borgella testified that, sometimes when he arrived for his shift at 4:00 p.m., Plaintiff already had done some prep work for him.  (TR at 204:14-23). Borgella also testified that, when there was a dinner buffet because of a down flight, Plaintiff would assist the staff by taking trays to and from the buffet, clearing tables, and helping cook. (TR at 204:24-205:15).

### (IV)   Alfonso Cristobal

Alfonso Cristobal testified that he began his employment with Vista JFK, LLC, on July 20, 2016, as the Hotel's Controller. (TR at 241:10-15). As Controller, Cristobal testified that he is responsible for monitoring and reviewing the financials of every department in the Hotel, including the F&B Department.   (TR at 250:18-251:2). Cristobal testified that the Executive Chef is responsible for purchasing all of the food in the Hotel, and he has the discretion to purchase whatever food he believes is needed.  (TR at 252:20-24). Cristobal stated that he did not have the authority to tell Plaintiff what food needed to be ordered, and that it was the Chef's responsibility to ensure that there was enough food in the Hotel.  (TR at 253:25-255:1). Cristobal also testified that it was the Chef's responsibility to count the food inventory, and Cristobal would then meet with the Chef to audit the inventory count.  (TR at 251:6-252:15). Cristobal specifically recalled meeting with Plaintiff in August 2016 to go over the inventory.  (TR at 242:23-243:18).

Cristobal also testified that Plaintiff, as Executive Chef, was responsible for controlling the operating costs of the kitchen.  (TR at 256:18-257:8). Cristobal testified that the Plaintiff was responsible for ensuring that the total food cost remained at or below a certain percentage of total revenue.  (TR at 256:18-257:8). Cristobal further stated that Plaintiff, as Executive Chef, was

responsible for managing the labor costs of the kitchen staff.  (TR at 255:20-256:1). Cristobal testified that Plaintiff would provide schedules to the general manager to prepare labor forecasts. (TR at 255:11-19). The Plaintiff would also provide Cristobal with the tip report.  (TR at 257:19-258:4).

Cristobal also testified that Plaintiff, as Executive Chef, attended daily standup meetings in the mornings with other departments heads.  (TR at 259:3-19). According to Cristobal, standup meetings took place at the bar near the kitchen.  (TR 259:17-259:18). Cristobal also testified that the Plaintiff attended weekly manager meetings in August and September 2016.  (TR 268:21-268:23).

### (V)   Darin Miller

Darin Miller testified that he is the Vice President of Operations for Vista Hospitality LLC. (TR at 339:4-16). As VP of Operations, Miller oversees a number of hotels in the Company's portfolio, and is responsible for the overall performance of those properties.  (TR at 339:5-340:4). In addition to his duties as VP of Operations, Miller testified that he served as the Hotel's Acting General Manager on several occasions during Plaintiff's employment.  (TR at 295:4-12;  297:23-298:23). Miller testified that, when he served as Acting GM, Plaintiff reported directly to him. (TR at 350:19-351:7). Miller further stated that the F&B Manager also reported to the GM, and that the Executive Chef did not report to the F&B Manager.  (TR at 350:19-351:7). Miller testified, in the absence of the other, either the Executive Chef or the F&B Manager would oversee the entire department, including the front of the house and the back of the house.  (TR at 321:12-19; 334:16-344:17; 338:5-339:1).

Miller testified that, as the Executive Chef, Plaintiff was responsible for purchasing all of the food for the Hotel.  (TR at 342:6-9; 344:11-345:16). Specifically, Miller testified that Plaintiff

would order food items from various vendors based on business demand and the needs of the Hotel.  (TR at 344:11-345:16). Miller further stated that it was Plaintiff's responsibility to ensure that the Hotel had the correct quantity of food and other items to get through a certain period of time.  (TR at 344:11-345:16). When food was delivered, Plaintiff was responsible for reviewing the invoices to verify that he actually received what he purchased, code the purchases, and approve the invoices.  (TR at 345:17-346:15). At the end of the month, the total purchases would be divided by total sales to determine the food cost, and that food cost was then reviewed by Plaintiff, the Controller, the General Manager, and Miller.  (TR at 345:17-348:5). Miller also stated that, on several occasions during Plaintiff's employment, the food costs in his department were high, and discussions were had involving Plaintiff, Miller, the General Manager and the Controller to determine the cause of the high food costs.  (TR at 348:6-349:2).

Miller also testified that Plaintiff played an "integral" role in menu pricing.  (TR at 349:3-19). That is, Miller testified that Plaintiff would help determine the retail price of menu items by providing input regarding the market price of food.  (TR at 349:3-19). Miller also stated that the restaurant menu changed several times during Plaintiff's employment, and that Plaintiff was involved in menu creation, selecting new menu items, establishing pricing, and determining how the items would ultimately be prepared.  (TR at 363:11-364:7).

Miller testified that one of Plaintiff's most important roles as Executive Chef was ensuring that the kitchen was clean, safe, and prepared to pass periodic health inspections.  (TR at 356:5-357:10). Miller stated that this was an ongoing responsibility, and that Plaintiff was expected to run a safe, clean operation at all times. (TR at 356:23-357:10). Plaintiff had a similar role with respect to brand inspections conducted by Radisson. (TR at 357:18-358:11). Among Plaintiff's responsibilities with respect to brand inspections was ensuring that the recordkeeping was in order,

the kitchen and restaurant were clean, and that any applicable brand standards were being met. (TR at 358:1-11).

Miller also testified regarding the applicable CBA. Specifically, Miller testified that, under the CBA, a non-union employee, like the Executive Chef, is precluded from regularly performing the work of a union employee.  (TR at 351:8-353:13). To be sure, Miller testified that management does have the right to assist staff and perform union duties on a limited basis, provided that doing so does not take away the job of a union employee.  (TR at 353:1-9). If a manager regularly performs union work, the union can file a grievance and, if successful, the Company would have to pay a union employee for the work performed by the manager.  (TR at 353:14-354:5).

**(VI)**   **Plaintiff Mohamad Elghourab**

Plaintiff testified that he was employed at the Hotel as Chef from September 7, 2011, to September 9, 2016. (TR at 371:4-371:7). Plaintiff testified that his initial salary was $55,000, which he received until 2014. (TR at 371:12-17). Plaintiff testified that, in 2014, his salary increased to $65,000, and then increased again to $69,000 in or about February or March 2016. (TR at 371:12-371:23). Plaintiff testified that he was always paid on time and his paychecks were never inaccurate. (TR at 483:9-483:11).

With respect to his work hours, Plaintiff testified that, during the years 2011 to 2014, he worked six (6) days per week, from 6:00 a.m. to 7:30 p.m.  (TR at 372:3-372:5). From March 2014 to March 2015, Plaintiff alleged that he was only required to work five (5) days per week because there was a F&B Manager at the Hotel. (TR at 373:7-373:10). Plaintiff alleged that during this period of March 2014 to March 2015, he worked from 6:00 or 7:00 a.m. to 7:00 or 8:00 p.m. each day. (TR at 374:1-374:24). Plaintiff next alleged that, from March 2015 through 2016, there was no F&B Manager at the Hotel. As a result, Plaintiff testified that he was required to work seven

11

days per week, from 6:00 a.m. to 8:00 or 9:00 p.m. (TR at 375:16-375:25). Finally, Plaintiff

testified that a F&B Manager was hired in February 2016, and as a result, Plaintiff's work hours

were drastically reduced. Specifically, Plaintiff testified that, from February 2016 through

September 2016, he worked only five (5) days per week, from 6:00 a.m. to 4:00 or 5:00 p.m. each

day. (TR at 376:4-376:10). However, Plaintiff subsequently testified that he did not come to work

at 6:00 a.m. every day, and that some days he came in around noon. (TR at 472:11-21).

Additionally, Plaintiff testified that it was always his decision what time he left for the day, and if

there was no business, then he would leave. (TR at 471:8-13).

Plaintiff admitted that he ordered food for the restaurant and would determine what to order

by looking in the freezer and estimating the amount of food to order. (TR at 403:4-404:14).

Plaintiff claimed that he did not know the price of the food that he ordered, then stated that chicken

was always "20 bucks." (TR at 405:2-8). Plaintiff testified that he did participate in counting the

inventory with the Controller, but that his only responsibility was to count the inventory, and the

Controller then calculates the food cost. (TR at 405:21-408:21). After stating that the menu never

changed during his employment, Plaintiff stated that the menu changed when the Hotel switched

from the DoubleTree brand to Radisson (TR 410:2-19).

Plaintiff alleged that general manager, Pierre Merhej, implemented the weekly manager

meetings in 2014 and 2015. (TR at 416:16-20; 418:1-9). Plaintiff testified that he attended the

manager meetings, but claimed that he only did so when there was no F&B Manager. (TR at 448:9-

15). In particular, Plaintiff testified that he attended a manager meeting on October 14, 2015,

during which he was asked by the GM what his plan was to improve the quality of the food, to

which he responded that they were adding cream to the eggs to keep them wet. (TR at 449:5-

453:3); *see also* Defendant's Trial Exhibit Z. During the same meeting, Plaintiff stated that his

12

food costs were high in response to complaints about serving dishes to the staff that were two days old. (TR at 455:9-456:11); *see also* Defendant's Trial Exhibit Z. Plaintiff also was asked about a meeting occurring on July 20, 2016, and despite the fact that the minutes indicated he was present, Plaintiff stated that he "absolutely" did not attend that meeting because Ram, the F&B Manager, was also present. (TR at 460:3-24); *see also* Defendant's Trial Exhibit FF. Nonetheless, the minutes indicated that, during the meeting, Plaintiff stated he would conduct more trainings and pictures would be taken so that the presentation of the food is consistent with every cook. (TR at 462:1-462:14); *see also* Defendant's Trial Exhibit FF.  In addition to manager meetings, Plaintiff also testified that he attended BEO meetings to plan and prepare for banquets, and that he was responsible for ordering food for the banquets. (TR at 483:12-484:19).

Plaintiff testified that it was the "chef's job" to ensure that the food was made correctly, and that if he saw one of the cooks doing something wrong, he would tell them, "don't do this again." (TR at 435:14-436:25). Plaintiff also admitted to meeting with Jaiwante Singh and taking her to HR to be hired. (TR at 438:2-439:4). Notably, while Plaintiff claimed that he did not ask her any questions and did not "interview" her, he then proceeded to list the questions he asked her, including if she was a good worker and wanted to work. (TR at 438:2-439:4). Plaintiff also testified to selecting Mohamed Hizam to work as a substitute cook. (TR at 424:19-425:17). Specifically, Plaintiff stated that the union sent over two candidates, and he selected Hizam for the position. (TR at 424:19-425:17; 441:16-442:8). Plaintiff alleged that he treated his cooks more as friends than as a boss. (TR at 470:23-470:24). Plaintiff admitted that it was his decision when to work and when to leave work. (TR at 471:8-471:11). Plaintiff admitted that a grievance was filed against him for performing union worker duties. (TR at 475:3-475:23).

Plaintiff alleged that he started his shifts by helping cook breakfast and helping get food

out for the breakfast buffet. (TR at 381:16-19). After breakfast, Plaintiff alleged that he received and stocked deliveries from U.S. Foods. (TR at 387:20-25, 388:20-23). He then alleged that he helped cook when there was a down flight for lunch buffets. (TR at 381:13-391:20). Plaintiff then claimed that every Friday through Sunday during his employment, the hotel had a banquet. (TR at 396:2-396:4).

Plaintiff alleged that the F&B Managers were his supervisors. (TR at 399:2-399:3). Plaintiff alleged that the food and beverage manager from 2011-2013, Amr, was responsible for managing vacation requests, payroll and tip reports. (TR at 401:2-401:24, 411:15-411:20, 412:17-412:21, 413:21-413:25). Plaintiff claims that he only wrote the schedule when there was no food and beverage manager. (TR at 442:15-442:17). Plaintiff admits that he would change the schedule by asking other cooks to work additional shifts of overtime to fill in for absences. (TR at 445:6-445:21, 447:11-447:15).

Plaintiff testified that as a manager he had an office. (TR at 489:18-489:19). Plaintiff testified that he would at times go to his office and relax. (TR at 489:15-489:19).

## **ARGUMENT**

### I.    **Plaintiff's Overtime Claims Under the FLSA and NYLL Fail Because He was exempt under the Executive Emption**

Under the FLSA, employers must pay employees, subject to certain exceptions, overtime compensation for all time worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Similarly, New York has adopted regulations that mirror the federal wage law and, as such, overtime claims made under the NYLL are to be analyzed under the rubric of the federal law. *See Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 519 (S.D.N.Y. 2013) ("Because New York's overtime provisions mirror and/or expressly adopt federal wage law, federal courts evaluate New

York's executive exemption by reference to the Fair Labor Standards Act of 1938, 29 U.S.C. §

201 *et seq.*, and its attendant regulations, set forth in the Code of Federal Regulations.") (quoting

*Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 289 n.5 (E.D.N.Y. 2010)).

      Both the FLSA and the NYLL provide a categorical exemption for employees who work

in a "bonda fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1);

N.Y. Lab. Law. § 651(5)(c). The FLSA does not define "bona fide executive, administrative, or

professional" employment, and instead directs the Secretary of Labor to "define[] and delimit[]"

those terms "from time to time by regulations." *Id.* at 559.

      Federal regulations provide that a bona fide executive is any employee:

> (1) Compensated on a **salary basis** at a rate of not less than $455 per week;
> (2) Whose **primary duty is management** of the enterprise in which the
> employee is employed or of a customarily recognized department or
> subdivision thereof; (3) Who customarily and regularly **directs the work** of
> two or more other employees; and (4) Who has the **authority to hire or fire**
> other employees or whose suggestions and recommendations as to the
> hiring, firing, advancement, promotion or any other change of status of
> other employees are given particular weight.

29 C.F.R. § 541.100(a) (emphasis supplied).[1]

      The determination as to whether an employee is exempt under the FLSA is "a mixed

question of law and fact." *Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014) (citation

omitted). "The question of how the employees spent their working time is a question of fact,"

whereas "[t]he question of whether their particular activities excluded them from the overtime

benefits of the FLSA is a question of law." *Id.*; *see also Krumholz v. Vill. of Northport*, 873 F.

Supp. 2d 481, 487 (E.D.N.Y. 2012) ("[I]t is a strict question of law whether the activities and

---

[1] The NYLL's executive employee exemption is interpreted similarly to the FLSA exemption,
except that: (1) the minimum salary required to qualify for the exemption is $825 per week; and
(2) the employee customarily and regularly exercises discretionary powers. 12 NYCRR § 142-
2.14(c)(4)(i)(a-e).

responsibilities of the employee, once established, exempt him or her from the FLSA's overtime requirements.") (quoting *Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 174 (E.D.N.Y. 2005)).

Throughout his employment with Vista JFK, Plaintiff clearly qualified for the executive exemption to the FLSA and the NYLL, each factor of which is addressed below.

### A. Plaintiff Was Compensated on Salary Basis Above the Threshold Amount

Plaintiff satisfies the first prong of the executive exemption because Plaintiff was compensated on a salary basis in excess of the FLSA and NYLL threshold salary requirements.

The FLSA's requirement that Plaintiff be compensated at a rate of not less than $455 per week and the NYLL minimum salary requirement of $825 per week are easily met. It is undisputed that Plaintiff was compensated on a salary basis and Plaintiff's starting annual salary was $55,000.00 (or $1,057.69 per week). Additionally, on or about May 30, 2014, Plaintiff's salary was increased to $65,000.00 (or $1,250.00 per week). Finally, on or about March 5, 2016, Plaintiff's salary was again increased to $69,000.00 (or $1,326.92 per week). At trial, Plaintiff confirmed that he was compensated in excess of the salary requirements. (TR at 371:4-371:23).

Thus, at all times, Plaintiff's salary exceeded the threshold for application of the executive exemption.

### B. Plaintiff's Primary Duty Was Management of the Hotel's Kitchen

Further, Plaintiff satisfies the second prong of the executive exemption because Plaintiff's primary duty was the management of the hotel's kitchen.

The term "managing" in the context of the executive exemption encompasses a broad range of activities, including but not limited to:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other

changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Importantly, to qualify for the exemption, the plaintiff need only perform *some* of these types of managerial duties, and the list provided in the regulations is not exhaustive of the type of duties that qualify as managerial. 29 C.F.R. § 541.102. The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "In determining an employee's primary duty, a court must consider all the facts in a case, 'with the major emphasis on the character of the employee's job as a whole.'" *Yesmin v. Rite Aid of N.Y. Inc.*, No. 10-CV-4157(ERK)(RER), 2012 U.S. Dist. LEXIS 127655, at *16 (E.D.N.Y. Sep 6, 2012) (quoting 29 C.F.R. § 541.700(a)).

The code identifies a list of non-exhaustive factors that a court should consider in determining the employee's primary duty, including: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* Moreover, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption." 29 C.F.R. § 541.106(a). That is, performance of non-exempt duties is not inconsistent with the executive exemption as managers are often required to multi-task and/or "jump in" to perform whatever needs to be done to ensure the overall profitability and success of their department. *See Scott v.*

*SSP Am., Inc.*, No. 09-CV-4399 (RRM)(VVP), 2011 U.S. Dist. LEXIS 32819, at *8 (E.D.N.Y. Mar. 29, 2011); *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1335 (N.D. Ga. 2005).

In the instant case, the evidence and testimony at trial demonstrates that Plaintiff's primary duty as Executive Chef was managing the hotel kitchen and at times the entire restaurant. The facts establish that Plaintiff performed a number of duties which are indicative of "management," including: reviewing and verifying time records of all kitchen employees for processing payroll; holding weekly meetings with the HR Manager to discuss payroll for kitchen employees; creating weekly tip reports (for tips received by servers, bartenders, etc.) based on the kitchen's prior week's sales; attending weekly hotel management meetings with the heads of other departments; interviewing, selecting, and otherwise weighing in on potential new hires in his department; purchasing all food to be served at the hotel restaurant and catered events; communicating with kitchen staff regarding inspections of the kitchen by various agencies; and overseeing and supervising the daily work of kitchen staff.

Thus, it is clear Plaintiff was engaged in numerous management functions recognized by 29 C.F.R. § 541.102 and that these management functions were Plaintiff's "primary duty," as defined by 29 C.F.R. § 541.700(a).

**(i)    the relative importance of the exempt duties as compared with other types of duties**

First, with regard to the relative importance of Plaintiff's duties, the relevant inquiry is whether the restaurant could not operate successfully unless the purported managerial functions assigned to [the] Executive Chef were performed. *See Tamayo v. DHR Rest. Co., LLC*, No. 14-CV-9633 (GBD), 2017 US Dist LEXIS 18102, at *15 (S.D.N.Y. Feb 3, 2017) (citing *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982)); *Scott v. SSP Am., Inc.*, No. 09-CV-4399 (RRM)(VVP), 2011 U.S. Dist. LEXIS 32819, at *24 (E.D.N.Y. Mar. 29, 2011)(finding that the

assistant manager was exempt because the managerial duties were more important to the success of Defendant's business than other duties she performed during the course of her employment).

In *Donovan v. Burger King Corp.*, the Second Circuit held that although managers spent at least half their time on nonexempt, manual work, their managerial responsibilities were the "most important or critical to the success of the restaurant. Specifically, the court stated:

> [I]t is clear that the restaurants could not operate successfully unless the managerial functions of Assistant Managers, such as determining amounts of food to be prepared, running cash checks, scheduling employees, keeping track of inventory, and assigning employees to particular jobs, were performed. For that reason, as well as the fact that much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of these employees is managerial."

*Scott*, 2011 U.S. Dist. LEXIS 32819, at *246 (citing *Donovan*, 75 F.2d 516, 521 (2d Cir. 1982) (emphasis added).

This standard is easily satisfied as without Plaintiff determining what food and other supplies were needed, ordering those supplies on a regular basis, preparing schedules, reviewing time records, interviewing and hiring prospective candidates, and preparing the kitchen for inspections, the restaurant could not have functioned.

During trial, Miller testified that Plaintiff was responsible for ordering food and supplies for the kitchen, and at times when no food and beverage manager was employed, Plaintiff would also be responsible for ordering beer, liquor and wine for the restaurant bar. 343:1-343:8. Ordering food for the hotel was an essential function of Plaintiff's job duties, as Miller testified that:

> Chef would order food items from these various vendors and he would do his purchasing based on timing, based on business demand, based on what the hotel needed. And it was his responsibility to make sure that he had the correct foods and items and quantities on hand to get us through a period of time. That period of time varied. It could be get us through the weekend, because we could order again on Monday. Or it could be because it's a frozen item it has a longer shelf life. Or could be daily or every two days because it's very perishable, a fresh item and the shelf life is low. So the executive chef works with all these variables within his control

> to determine how much food, what kind of food, where it's to be ordered from. And then if a chef, or in this case him, he didn't order properly or we felt that it wasn't following within parameters, we would discuss changing vendors or changing the order schedules or vary the process to improve the eventual outcome of what we were trying to accomplish.

(TR at 344:11-345:11). Miller further testified that "There are a lot of variables that go into managing your food costs. And chefs and general managers have to make sure that those standards and procedures are in place, and if one or two or a combination of several, that can alter your food cost and cause management problems." (TR at 348:22-349:2).

In his own words concerning how he determined what food to order from U.S. Foods, Plaintiff testified that "I organize it, I control it, big time. So I work hard, and I know that I need this, and I need that, and I order twice a week." (TR at 403:22-404:3). Additionally, when asked by the Court at trial about whether there was a set amount of chicken he was supposed to have, Plaintiff testified:

> What I have to estimate it, like we are airport hotel. So if distressed passenger walk in at anytime, you cannot tell them I don't have food. So I have to have extra. All the time. In the freezer. You cannot say, oh, listen, oh, okay, I'm going to go buy the food now. No. We have to have the food. So it is not specific like I need to order two cases only. I order five or four. And I put them in the freezer, we see what happens. You are not going to go bad. And then we go from there.

(TR at 404:4-404:14). Not only was Plaintiff responsible for ordering food, but he was responsible for maintaining food costs to within the budgeted guidelines. (TR at 257:16-257:18). Cristobal testified that it was the Plaintiff's duty to control the operating costs, including food and labor, for the kitchen. (TR at 256:18-256:20). Accordingly, if Plaintiff did not properly estimate and order correct amount of food, the restaurant faced serious ramifications such as customer complaints, high food costs, and lost revenue.

Additionally, it was equally as important that Plaintiff prepare the kitchen for health inspections. Miller testified that this one of Plaintiff's "most important roles" and that Plaintiff was

responsible for ensuring that the hotel was running a clean and safe kitchen, restaurant, and operation inside of the hotel so that there were few violations. (TR at 356:17-356:22). When asked if this was something that Plaintiff was responsible for once a year, Miller further testified that

> I would say it is an ongoing responsibility. We can't just clean and fix things and maintain and follow the rules and regulations and procedures in preparation for impending inspection. That's not very safe, and that's not very ethical. We expect higher standards, we expect them to maintain all the procedures and practices on a regular basis for good quality, good service, taste, tasty, you know, a lot of reasons why it is just good practice to run a safe and clean operation in the kitchen and restaurant at all times. So it is an ongoing responsibility, but definitely it comes out with a higher sense of urgency when it is inspection time.

(TR at 356:25-357:10). If the restaurant was to fail a health inspection, it would be in danger of shutting down.

With respect to corporate brand inspections, Plaintiff was responsible for maintaining that the kitchen was clean for inspections. Moreover, Miller testified that Plaintiff had several job duties with respect to brand inspections including making sure recordkeeping was in order, making sure the kitchen and food and beverage department areas were clean, making sure that the brand standards were met (i.e. having the proper logo of the Radisson on coffee cups and napkins), making sure serving the correct foods were on the menu and making sure that the training was complete for staff and team members. (TR at 358:1-358:8). This job duty was important because if Respondent were to fail the brand inspections, it could lose its right to use the brand.

As the Executive Chef, Plaintiff was responsible for writing the schedule every week, and accounting for vacation time, sick leave, and banquets and other events. (TR at 70:15-71:1). Berrones testified that Plaintiff would submit the weekly schedule to Human Resources and the General Manager to approve the schedule before he posted it in the department. (TR at 71:2-72:4). Plaintiff was also responsible for scheduling cooks to work special events and banquets when they needed coverage. (TR at 71:7-71:15). Not only was Plaintiff's duty to schedule important for the

operational purposes of having the necessary staff in attendance to operate the department, but it was important because the weekly schedule was used by Respondent to predict its labor forecast. Cristobal testified that:

> The labor forecasts, actually the plaintiff would have to be -- the week's schedule -- he gives his week's schedule, actually, to the general manager. The general manager has to approve it, will approve it, reviews and approves it and gives it to human resources and then I go ahead and get it so I can put it together and put the numbers together. Then the labor -- the forecast is then submitted to our corporate office.

(TR at 255:12-255:19).

Furthermore, Plaintiff was responsible for verifying the payroll punches of employees in his department to verify that the hours that were punched in were correct. Berrones testified that as a department head, Plaintiff would review and verify the payroll punches and send the payroll record back to her so that she could meet with Plaintiff to make sure that the hours punched in by the kitchen staff were accurate. (TR at 75:11-76:18). In the absence of a F&B Manager, Plaintiff would also review and verify the payroll punches for both the front of the house and back of the house staff. (TR at 76:25-77:10). This managerial duty was essential because, without Plaintiff verifying the accuracy of the punch reports and accounting for overtime, vacation, and other leave, the staff would not have been properly compensated.

Additionally, Plaintiff was responsible for verifying the weekly tip reports for the front of the house employees. (TR at 77:13-77:24, 170:6-170:21). Plaintiff would enter the information into the tip report, and provide it to the Controller who then sent it to HR for processing and payment. (TR at 77:13-77:24, 258:1-258:12). The front of the house staff received tips and it was essential that he performed his managerial duty in order for them to be compensated accurately.

Plaintiff was responsible for hiring kitchen and interviewing employees. When asked about Plaintiff's responsibilities with respect to hiring employees, Berrones testified that:

> He has hired if there's a position available in his department or even if it's a substitute he needs, I put that request into the union and if the union sends us any candidates, I will let Chef know this candidate is coming in at this time, are you available to meet with him or her, go meet with that candidate and then he will back and let me know if he wants whatever person he met with.

(TR at 78:3-78:10). Specifically, Plaintiff interviewed Jawainte Singh and after interviewing her, he informed Selma when he wanted her to start. (TR at 80:3-80:11). Plaintiff testified that he told Ms. Singh that they "badly need dishwasher" and asked Ms. Singh basic questions such as "you a good worker?" before bringing her upstairs to HR to handle the paperwork. (TR at 438:11-438:22). Plaintiff also testified Ms. Singh that was hired because Mr. Miller complained about the overtime costs of dishwashers in the kitchen. (TR at 438:24-439:4). Moreover, Plaintiff also hired Mohamed Hizam when he needed a substitute part time cook and admitted during his deposition that he selected Hizam. (TR at 96:3-96:15, 440:22-441:8). Hiring employees was an important function of Plaintiff's job because Respondent's food and beverage labor costs would increase when they had to pay overtime to scheduled staff.

Plaintiff was responsible for purchasing supplies for the kitchen. (TR at 343:1-343:8). Miller testified that managers in the food and beverage department submitted purchase orders for supplies such as plastics, chemicals and paper, and that he was responsible for approving the purchase orders. (TR at 343:9-344:7). Indeed, Miller testified that he approved many purchase orders submitted by Plaintiff. (TR at 344:8-344:10). The supplies Plaintiff ordered were necessary for the staff of the kitchen, and at times for the entire food and beverage department, to effectively perform their job duties.

**(ii)    the amount of time spent performing exempt work**

Second, as to the amount of time he spent performing managerial duties, the evidence establishes that Plaintiff's exempt duties were regular and re-occurring management functions that

Plaintiff performed on a daily basis, and that he spent the overwhelming majority of his time performing those functions.

"The time an employee spends performing exempt work is an important but non-determinative factor in determining an employee's primary duty." *Ruggles v. Wellpoint, Inc.*, No. 08-CV-0201(LEK), 272 F.R.D. 320, 2011 U.S. Dist. LEXIS 17310, at *20 (N.D.N.Y Feb. 22, 2011) (citing 29 C.F.R. § 541.700(b) ("Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.")). According to the regulations, management activities include, but are not limited to:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. (emphasis added).

Here, Plaintiff spent a majority of his time working in the kitchen performing his managerial responsibilities of supervising the kitchen staff. The kitchen employees reported to Plaintiff and his responsibility was to be present and help when needed. (TR at 155:12-155:17, 222:18-223:7). Indeed, Borgella testified that Plaintiff supervised his work by telling him "what to do, how to fix it." (TR at 223:19-223:21). Similarly, Reyes testified that Plaintiff supervised his work by instructing him what to cook for lunch buffets and special events. (TR at 155:12-156:13). At trial, Berrones explained that Plaintiff's job duties included supervising the kitchen staff,

ordering food, attending meetings and doing whatever was needed in the food and beverage department. (TR at 66:10-66:15). Moreover, in the absence of a F&B Manager, Plaintiff supervised the entire front of the house staff. Nonetheless, when Plaintiff was not supervising the kitchen staff, Reyes testified that Plaintiff worked in his office on his computer for a least two hours during his shifts. (TR at 154:17-155:1).

Moreover, as a non-union manager in the union hotel, Plaintiff was precluded from regularly performing non-exempt work. That is, Miller testified that managers are not permitted to perform union work and if a manager regularly performs union work, the union can file a grievance and a union employee would be entitled to payment for the work performed by the manager. (TR at 304:24-304:25, 353:14-354:5). In fact Plaintiff testified that a grievance was filed against him for performing union work, and that a union employee received compensation as a result. (TR at 475:3-475:23). To be clear, when a non-union employee regularly performs the work of a union employee, the union employee is entitled to be compensated for that work. If Plaintiff was regularly performing union work as he alleges, certainly more grievances would have been filed by union employees seeking compensation.

Nonetheless, during his trial testimony, Plaintiff surprisingly testified that he spent 90 percent of his time performing non-exempt work, and 10 percent performing managerial functions, but only when there was no F&B Manager. First, it is unclear whether Plaintiff understands that directing the work of employees in the kitchen constitutes managing. Second, Reyes and Borgella's testimony belies any claim that Plaintiff' was cooking for 90 percent of his time. Reyes testified that Plaintiff did not help him cook, (TR at 143:11-17; 173:16-17), and Borgella testified that Plaintiff only assisted during times when there was a down flight at the hotel. (TR at 204:18-

21, 205:17-22, 206:1013.) Third, even if Plaintiff spent a majority of his time working in the kitchen as he claims, this does not, in itself, dispose of the primary duty inquiry.

Where an exempt employee occasionally performs non-exempt work, the focus is on whether the employee "remain[s] responsible for the success or failure of business operations under their management while performing the nonexempt work." 29 C.F.R. § 541.106(a). In *Scott*, even though an assistant manager testified that she spent the majority of her time performing non-managerial tasks, her primary duty was management because she continued to supervise her subordinates and the success of the defendant's business was more dependent on the manager's management duties than her other duties. 2011 U.S. Dist. LEXIS 32819, at *9-10; see also *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113-14 (9th Cir. 2001) (holding although plaintiffs "spent ninety percent of their time on nonexempt tasks," the court does not presume that the executive exemption fails merely because the proportion of time spent on exempt managerial tasks is less than fifty percent because where "managerial duties are packaged in employment with non-managerial tasks, and the management function cannot readily and economically be separated from the nonexempt tasks" (citations omitted)); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982) (finding although plaintiff performed nonexempt tasks more than fifty percent of the time, management was still primary duty, in part because "much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work"); *Mullins v. City of N.Y.*, 523 F. Supp. 2d 339, 357 (S.D.N.Y. 2007) ("[T]he fact that plaintiffs spend most of their shifts working alongside their subordinates and performing many of the same law enforcement tasks does not, in itself, dispose of the primary duty inquiry. Indeed, courts have found parties to be exempt executives even when they spend up to ninety percent of their time performing non-exempt tasks." (citing *Baldwin*, 266 F.3d at 1113-14)).

Here, it is undeniable that Plaintiff was responsible for the success of the kitchen, and the restaurant as a whole, and had the autonomy to engage in non-exempt work at his discretion when the needs of the business so required. When Plaintiff occasionally performed non-exempt work, he did so at his discretion and for the purpose of ensuring the success of his department. Plaintiff also controlled the restaurant's operating costs and had complete discretion to order food. (TR at 256:18-256:20). Plaintiff was especially responsible for the success of the kitchen and did so by conducting inventory, verifying time records and payroll, writing schedules, approving vacation requests, interviewing and hiring prospective candidates, and preparing the kitchen for inspections.

Moreover, there is a fatal flaw in Plaintiff's testimony that all but refutes any claim that his duties were not primarily managerial. That is, Plaintiff testifies that his work hours varied dramatically depending on whether or not there was a F&B Manager. Specifically, Plaintiff claimed that, from March 2014 to March 2015, he was only required to work five (5) days per week because there was a F&B Manager at the Hotel. (TR at 373:7-373:10). Plaintiff next alleged that, from March 2015 through 2016, there was no F&B Manager at the Hotel, and as a result, he claimed that he was required to work seven days per week, from 6:00 am to 8:00 or 9:00 pm. (TR at 375:16-375:25). Finally, Plaintiff testified that a F&B Manager was hired in February 2016, and as a result, he once again only worked five (5) days per week, from 6:00 a.m. to 4:00 or 5:00 p.m. each day. (TR at 376:4-376:10). The problem with Plaintiff's argument, however, is that, if the overwhelming majority of his time was spent performing non-managerial work, then there is absolutely no reason why his hours should be so drastically affected by the presence of another manager. It is undisputed that the F&B Manager was a managerial employee, and there is no testimony or even allegations suggesting that the F&B Manager was cooking, stocking deliveries, carrying trays to/from the buffet, or performing any of the other non-managerial tasks that Plaintiff

claims to have performed on a regular basis. Therefore, to the extent that Plaintiff's workload was so heavily reduced by the presence of a F&B Manager, there is only one logical explanation— Plaintiff was a managerial employee performing primarily managerial functions.

**(iii)   the employee's relative freedom from direct supervision**

Third, Plaintiff, as with the other members of the hotel's management team, reported directly to the General Manager of the hotel and was relatively free from direct supervision. Simply put, there was no intermediate supervisor who directly oversaw or ensured that Plaintiff performed his duties; his position worked in conjunction with the rest of the management team.

Plaintiff performed his duties with relative freedom from direct supervision. Plaintiff determined the hours he worked and would decide which employees to assist and how. (TR at 319:14-319:17, 467:22-468:8). Moreover, Cristobal testified that Plaintiff had the sole discretion to purchase food for the food and beverage department and agreed that the food and beverage department "is given carte blanch to purchase whatever it needs to make sure that the restaurant has enough food and enough liquor." (TR at 247:7-12, 248:17-248:20, 253:20-253:24). Plaintiff was responsible for reviewing the food inventory, making a decision as to what items were needed, and then ordering the food directly from the supplier. (TR at 252:20-253:3).

Finally, Plaintiff's testimony that he was not a manager and reported to the F&B Manager is belied by the evidence. Every witness testified that Plaintiff was a manager, and that the Executive Chef was responsible for the back of the house, while the F&B Manager was responsible for the front of the house. Indeed, even Plaintiff's own ridiculous assertion that he reported to the F&B Manager supports a finding that Plaintiff was relatively free from supervision—that is, because there was no F&B Manager for roughly half of Plaintiff's employment, by his account, he spent have of his employment with no supervisor at all.

(iv)    **the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.**

Fourth, looking next at the relationship to wages paid to other employees for performance of non-exempt work, the pay disparity in compensation between Plaintiff and non-exempt employees supports the conclusion that Plaintiff's performance of non-exempt work was incidental to his primary duty of management.

Courts regularly have rejected engaging in "mathematical gymnastics" by dividing a manager's weekly salary by the number of hours worked each week to determine an hourly wage, and instead compare "the manager's weekly salary with the highest possible non-exempt weekly wage . . . ." *Amash v. Home Depot U.S.A., Inc.*, No. 1:12-cv-837, 2014 U.S. Dist. LEXIS 79761, at *17 (N.D.N.Y. June 12, 2014); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1278-79 (S.D. Fla. 2004) (declining to reduce salary to hourly rate where the manager made at least $250 more per month than the assistant manager and was the only worker eligible for a bonus).

Here, the record demonstrates that Plaintiff consistently earned significantly more than his subordinates. For example, in 2016, Plaintiff's salary was $69,000, while the next highest earner was Jorge Reyes, who earned nearly $10,000 less than Plaintiff while also being paid overtime. The disparity in wages is even greater when Plaintiff's salary is compared to the other members of the kitchen staff. *See* Plaintiff's Trial Exhibits P1-P23.

Additionally, as a managerial employee, Plaintiff was eligible for and received several bonuses, while the other kitchen staff did not. *See* Plaintiff's Trial Exhibits P1-P6.

Accordingly, all four of the applicable factors support the conclusion that Plaintiff's primary duty was management.

**C.  Plaintiff Directed the Work of Two or More Employees**

The third prong of the executive exemption analysis requires that the employee must customarily and regularly direct the work of at least two or more other full-time employees or their equivalent. 29 C.F.R. 541.100(a)(3).

Here, Plaintiff regularly and customarily directed the work of the entire kitchen staff. On any given shift, there were two or more kitchen employees reporting directly to Plaintiff, and Plaintiff was solely responsible for overseeing and supervising their work. Notably, Plaintiff testified that it was the "chef's job" to ensure that the food was made correctly, and that if he saw one of the cooks doing something wrong, he would tell them, "don't do this again." (TR at 435:14-436:25). Plaintiff also directed the cooks by instructing them on how to present food, how to cook healthier in a healthier manner. Borgella testified that Plaintiff instructed him on proper food presentation, and that, when new menu items were added, Plaintiff would instruct him how to prepare and present them. (TR at 232:1-233:22). Additionally, Reyes testified that Plaintiff would instruct him which food to serve and in what manner.  (TR at 156:4-13). Reyes also stated that Plaintiff instructed him to use "less salt" when customers complained about the saltiness of food. Plaintiff would also direct both Reyes and Borgella on what sandwiches and salads to cook for the restaurant galley. (TR at 169:11-169:20, 172:15-172:22). Likewise, Reyes and Borgella testified that Plaintiff would instruct them to clean the kitchen when there were inspections. (TR at 167:7-167:10, 229:16-230:03). Additionally, Plaintiff taught Reyes and Borgella how to present and prepare new dishes when there was a menu change. (TR at 168:11-168:17, 232:1-232:9, 233:18-233:22). The minutes from the manager meetings further illustrate Plaintiff's responsibilities with respect to directing the work of employees. Specifically, during the July 20, 2016, Plaintiff stated that he "Will be coming in on the night shift and work more with the cooks. There will be more

training and pictures will be taken so that the presentation of the food is same with every cook."
(TR at 462:1-462:14); *see also* Defendant's Trial Exhibit FF.

Accordingly, the evidence clearly demonstrates that Plaintiff regularly directed the work of two or more employees.

### D. Plaintiff Had Hiring Authority

Lastly, the fourth prong of the executive exemption is met because Plaintiff's recommendations with respect to hiring were afforded particular weight.

Under the FLSA, a bona fide executive must have the authority to hire or fire other employees or the executive's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees must be given particular weight. 29 C.F.R. 541.100(a)(4). "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. 41.105.

Further, the "hiring or firing or making recommendations" prong is read in the disjunctive, so plaintiff need *not* have authority to provide guidance in all areas. *See, e.g.*, Preamble to the August 2004 U.S. Department of Labor regulations ("An employee who provides guidance on *any one* of the specified changes in employment status may meet the section 541.100(a)(4) requirement.") (emphasis added).

In the instant case, Plaintiff admits that his duties included weighing in on potential new hires for staff positions in the kitchen and admits that he made recommendations regarding two new hires during his tenure. Berrones testified that Plaintiff met with candidates and would then let her know "if he wants whatever person he met with." (TR at 78:3-78:10). Specifically, Berrones

testified that Plaintiff was responsible for hiring Jaiwante Singh as a dishwasher and Mohamad Hizam as a substitute cook. (TR at 79:16-80:11; 96:6-15). Moreover, Plaintiff admitted that met with Jaiwante Singh and asked her questions before bringing her to HR to be hired, and that he "selected" Mohamad Hizam to work as a substitute cook. (TR at 96:3-96:15, 440:22-441:8). Thus, Plaintiff was primarily responsible for selecting the only two members of the kitchen staff that were hired during his employment. Accordingly, the fourth prong of the executive exemption is satisfied.

Thus, because Plaintiff has satisfied all of the requirements for application of the executive exemption, his claims for overtime compensation under the FLSA and NYLL must fail.

## II.   Statutory Wage Notice Claim Under NYLL § 195(1)

In the complaint, Plaintiff also raises a claim for a statutory wage notice violation under NYLL § 195(1).

NYLL section 195(1)(a) requires "[e]very employer" to provide his or her employees, "in writing . . . at the time of hiring," a notice containing the following information:

> [T]he rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

NYLL § 195(1)(a).

The employer must then "obtain from the employee a signed and dated written acknowledgement . . . of receipt of this notice." *Id.* "For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise

provided by New York state law or regulation, the notice must state the regular hourly rate and overtime rate of pay." *Id.*

However, there is no liability where an employee has timely received all pay owed to him, as set forth in the complete affirmative defense contained in NYLL § 198(1-b):

> In any action or administrative proceeding to recover damages for violation of paragraph (a) of subdivision one of section one hundred ninety-five of this article, it shall be an affirmative defense that (i) the employer made complete and timely payment of all wages due pursuant to this article or article nineteen or article nineteen-A of this chapter to the employee who was not provided notice as required by subdivision one of section one hundred ninety-five of this article […]

NYLL § 198(1-b).

In the instant case, to the extent Plaintiff was not provided a wage notice as alleged, Defendant's technical violation of the statute is immaterial because Plaintiff admits that he received timely payment of his wages for the entirety of his employment with Vista JFK and that these payments were always in the correct amount owed to him. (TR at 483:9-483:11).

Therefore, Defendant cannot be held liable for any notice violation because the statutory affirmative defense of complete and timely payment under NYLL § 198(1-b) applies.

## **CONCLUSION**

Based on the foregoing, Defendant respectfully requests a Decision and Order finding that Plaintiff's claims for overtime compensation under the FLSA and NYLL be dismissed in their entirety.


Dated:      New York, New York
            May 29, 2019

Respectfully submitted,

GORDON REES SCULLY
MANSUKHANI, LLP


By:   */s/   Christopher A. Seacord*

Christopher A. Seacord
Alex D. Dumas
1 Battery Park Plaza, 28th Floor
New York, New York 10004
Tel: (212) 269-5500
Fax: (212) 269-5505
cseacord@grsm.com
adumas@grsm.com

*Attorneys for Defendant*
*Vista JFK, LLC*

34