UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MOHAMED ELGHOURAB,

        Plaintiff,

                                Case No. 17-CV-00911 (ARR)(ST)

  -against-


VISTA JFK, LLC,

        Defendant.


-----------------------------------------------------------------X


## DEFENDANT VISTA JFK, LLC'S POST-TRIAL REPLY BRIEF


**GORDON REES SCULLY MANSUKHANI, LLP**
ATTORNEYS FOR DEFENDANT VISTA JFK, LLC
ONE BATTERY PARK PLAZA, 28TH FL
NEW YORK, NEW YORK 10004
PHONE: (212) 269.5500
FAX:   (212) 269.5505

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......................................................................................... 1

SUMMARY OF TESTIMONY AND EVIDENCE ........................................................... 2

ARGUMENT ..................................................................................................................... 2

I.     Standard of Proof for the Executive Exemption ...................................................... 2

II.    Plaintiff falls under the Definition of a "Bona Fide Executive" Under the FLSA
      and NYLL ................................................................................................................ 3

      A.    Plaintiff's Primary Job Duty Was Management ......................................... 3

            (1)    The relative importance of Plaintiff's exempt duties far outweighs any
                  other types of duties .................................................................... 8

            (2)    The amount of time spent performing exempt work ................................ 10

            (3)    Plaintiff performed his duties with relative freedom from direct
                  supervision .............................................................................. 11

            (4)    The relationship between the Plaintiff's salary and the wages paid to other
                  employees for the kind of nonexempt work performed by the employee 12

                  i.    Plaintiff worked approximately 50 hours per week throughout his
                        employment ................................................................... 13

                  ii.    Plaintiff earned more per hour than other kitchen staff ............... 15

      B.    Plaintiff Regularly Directed The Work Of Two Or More Employees ................. 15

      C.    Plaintiff's Recommendations With Respect to Hiring Were Given Particular
           Weight .................................................................................................. 17

III.   Plaintiff's Statutory Wage Notice Claim Under NYLL § 195(1) Fails ........................... 18

IV.   Plaintiff's Actual Hours Worked Are Approximately 50 Hours Per Week..................... 18

V.    Plaintiff Is Not Entitled To Liquidated Damages ............................................................ 19

VI.   Plaintiff Is Not Entitled To Prejudgment Interest Under The NYLL ............................. 19

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Amash v. Home Depot U.S.A., Inc.*,
No. 1:12-cv-837, 2014 U.S. Dist. LEXIS 79761 (N.D.N.Y. June 12, 2014) ........................... 13

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946) ............................................................... 13

*Begum v. Ariba Disc., Inc.*,
No. 12 Civ. 6620 (DLC), 2015 U.S. Dist. LEXIS 5598, 2015 WL 223780,
(S.D.N.Y. Jan. 16, 2015) ........................................................................................................... 19

*Bilyou v. Dutchess Beer Distribs., Inc.*,
300 F. 3d 217 (2d Cir. 2002) ....................................................................................................... 2

*Carhuapoma v. N.Y.-Presbyterian Healthcare Sys.*,
2013 U.S. Dist. LEXIS 45886 (S.D.N.Y. Mar. 29, 2013) .............................................. 9, 10, 11

*Cavalotti v. Daddyo's BBQ, Inc.*,
2018 U.S. Dist. LEXIS 154918 (E.D.N.Y. Sep. 8, 2018) ........................................................ 20

*Doo Nam Yang v. ACBL Corp.*,
427 F. Supp. 2d 327 (S.D.N.Y. 2005) ...................................................................................... 20

*Elghourab v. Vista JFK, LLC*,
No. 17-cv-911 (ARR) (ST), No. 17-CV-00911 (ARR)(ST), 2018 U.S. Dist. LEXIS
200556 (E.D.N.Y. Nov. 27, 2018) .................................................................................. 9, 12, 16

*Fermin v. Las Delicias Peruanas Rest., Inc.*,
93 F. Supp. 3d 19 (E.D.N.Y. 2015) .......................................................................................... 19

*Golden v. Merrill Lynch & Co.*,
No. 06 Civ. 2970 (RWS), 2007 U.S. Dist. LEXIS 90106 (S.D.N.Y. Dec. 6, 2007) .................. 3

*Indergit v. Rite Aid Corp.*,
Nos. 08 Civ. 9361(PGG), 08 Civ. 11364 (PGG), 2010 U.S. Dist. LEXIS 32322,
2010 WL 1327242 (S.D.N.Y. Mar. 31, 2010) ........................................................................... 9

*Mullins v. City of N.Y.*,
523 F. Supp. 2d 339 (S.D.N.Y. 2007) ...................................................................................... 16

*Paganas v. Total Maint. Sol., LLC*,
220 F. Supp. 3d 247 (E.D.N.Y. 2016) ...................................................................................... 10

*Perkins v. S. New Eng. Tel. Co.*,
No. 3:07-CV-967 (JCH), 2012 U.S. Dist. LEXIS 18943 (D. Conn. Feb. 14, 2012) .................. 2

*Ruggles v. Wellpoint, Inc*.,
   No. 08-CV-0201(LEK), 272 F.R.D. 320, 2011 U.S. Dist. LEXIS 17310
   (N.D.N.Y Feb. 22, 2011) ................................................................................................. 10

*Scott v. SSP Am., Inc.*,
   No. 09-CV-4399 (RRM)(VVP), 2011 U.S. Dist. LEXIS 32819 (E.D.N.Y. Mar. 29,
   2011) .................................................................................................................................. 2

*Yu Y. Ho v. Sim Enterps., Inc.*,
   No. 11 CV 2855, 2014 U.S. Dist. LEXIS 66408, 2014 WL 1998237
   (S.D.N.Y. May 14, 2014) ................................................................................................. 13

**Statutes**

29 U.S.C. § 260 ....................................................................................................................... 19

N.Y.C.P.L.R. § 5004 .............................................................................................................. 19

NYLL § 195(1) ........................................................................................................................ 18

NYLL § 198(1-b) ..................................................................................................................... 18

**Regulations**

29 C.F.R. § 541.100(a) .............................................................................................................. 3

29 C.F.R. § 541.106(a) ............................................................................................................ 11

29 C.F.R. § 541.700(b) ............................................................................................................ 10

29 C.F.R. 541.100(a)(3) .......................................................................................................... 16

Defendant Vista JFK, LLC ("Defendant" or "Vista JFK"), by and through its counsel, Gordon Rees Scully Mansukhani, LLP, hereby submits its Post-Trial Reply Brief following the formal hearing held on May 21 and 22, 2019, in Brooklyn, New York, before the Honorable Allyne R. Ross, United States District Court Judge for the Eastern District of New York.

## PRELIMINARY STATEMENT

Despite Plaintiff's attempts to twist the evidence and testimony, it simply cannot be reasonably disputed that Plaintiff was properly classified as an exempt executive not entitled to overtime compensation under the FLSA or NYLL. Plaintiff took his best shot at muddying the waters by calling for unnecessary documentation, confusing witnesses by impeaching them with *consistent* deposition testimony, and mischaracterizing the nature of Plaintiff's actual responsibilities as the Executive Chef. However, witness after witness testified that Plaintiff was a manager, and his primary duties were managerial.

From the beginning of his employment, Plaintiff's duties included, among other things, drafting the weekly schedule for employees and revising as needed, approving vacation and other leave requests, ordering the food and other supplies for the hotel, deciding what food would be served to hotel employees in the employee cafeteria, instructing and training employees on proper food preparation, taking inventory, interviewing and hiring staff, verifying the accuracy of weekly payroll records, attending daily and weekly managers meetings, and ensuring that the kitchen was prepared to pass periodic health and brand inspections. These managerial duties are important and demonstrate that the success of the restaurant depended on Plaintiff's management and control of the kitchen. Admittedly, as managers were permitted in rare circumstances to do under the Collective Bargaining Agreement ("CBA"), Plaintiff would occasionally step in to assist the union staff when the restaurant was busy because of a "down flight." However, even when he assisted

1

the kitchen staff, he did so at his discretion, with little to no direct supervision. Not only did Plaintiff decide what hours he worked, but also what he did, minute by minute, during those hours.

Here, Defendant has supported its position with credible testimony from multiple witnesses and corroborating documentation. In contrast, Plaintiff relies solely on his own self-serving, and wildly inconsistent testimony. Accordingly, because the evidence clearly establishes that Plaintiff was properly classified as an exempt executive, his claims for overtime compensation under the FLSA and NYLL must fail.

## SUMMARY OF TESTIMONY AND EVIDENCE

We respectfully turn the Court's attention to the Summary of Testimony and Evidence submitted in Defendant's Post-Trial Brief. *See* Doc. 64, Defendant's Post-Trial Brief at pp. 2-14.

## ARGUMENT

### I.     Standard of Proof for the Executive Exemption

From the outset, Plaintiff attempts to complicate matters by suggesting that the executive exemption is subject to a heightened "clear and convincing" evidence standard. Plaintiff is mistaken.  "Since this exemption provides an affirmative defense to overtime claims, the employer has the burden of proving that a plaintiff is an exempt 'bona fide executive' by a preponderance of the evidence." *Scott v. SSP Am., Inc.*, No. 09-CV-4399 (RRM)(VVP), 2011 U.S. Dist. LEXIS 32819, at *18-19 (E.D.N.Y. Mar. 29, 2011)(citing *Bilyou v. Dutchess Beer Distribs., Inc*., 300 F. 3d 217, 222 (2d Cir. 2002)). Thus, in the Second Circuit, most courts have applied a "preponderance of the evidence" standard to determine whether an exemption applies. *See Perkins v. S. New Eng. Tel. Co*., No. 3:07-CV-967 (JCH), 2012 U.S. Dist. LEXIS 18943, at *10 (D. Conn. Feb. 14, 2012) (electing not to use "clear and convincing evidence" standard of review for the

2

executive exemption because most courts in the Second Circuit have applied a preponderance of the evidence standard of proof); *see also Golden v. Merrill Lynch & Co.*, No. 06 Civ. 2970 (RWS), 2007 U.S. Dist. LEXIS 90106, at *44 (S.D.N.Y. Dec. 6, 2007) ("[I]n the Second Circuit, employers bear the burden of proof to establish an exemption only by a preponderance of the evidence.").

Accordingly, the proper standard of review for determining whether Plaintiff was exempt is by a "preponderance of evidence," and not the "clear and convincing evidence" standard claimed by Plaintiff. Regardless, Defendant has met its burden documentation and compelling testimony from multiple witnesses.

**II.      Plaintiff falls under the Definition of a "Bona Fide Executive" Under the FLSA and NYLL**

As set forth in Defendant's Initial Brief, the Department of Labor ("DOL") defines an "executive" as any employee:

> (1) [c]ompensated on a salary basis at a rate of not less than $ 455 per week;
> (2) [w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof;
> (3) [w]ho customarily and regularly directs the work of two or more other employees; and
> (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2004). Here, there is no dispute that Plaintiff received a salary in excess of the amount required under the FLSA and New York state law. The parties do dispute whether Plaintiff's "primary duty" was management, whether Plaintiff customarily and regularly directed the work of two or more employees, and whether Plaintiff had the authority to hire or recommend the hiring of other employees. Each of these disputed issues will be addressed in turn.

**A.      Plaintiff's Primary Job Duty Was Management**

As demonstrated in Defendant's Initial Brief, the evidence and testimony presented at trial

clearly establishes that Plaintiff's primary duty as Executive Chef was managing the hotel kitchen and, at times, the entire restaurant. Likewise, the evidence and testimony at trial directly contradicts Plaintiff's dubious claim that he was employed as a full-time cook from September 9, 2011 through September 9, 2016. To be clear, cooks are not required to attend daily/weekly management meetings; cooks are not responsible for ordering food for the entire hotel; cooks do not interview and suggest the hiring of other cooks and dishwashers; cooks are not responsible for approving the vacation requests of kitchen staff; cooks do not supervise kitchen staff and have kitchen staff report to them; cooks are not responsible for writing the weekly schedule for kitchen staff and, at times, the entire restaurant; cooks are not responsible for scheduling other cooks for banquets, weddings and other special events; cooks are not responsible for verifying the accuracy of employee payroll records; cooks are not responsible for instructing the kitchen staff on what to clean for inspections; cooks are not responsible for instructing other cooks how to prepare and present food; cooks do not participate in determining menu changes; cooks do not have their own office; and cooks do not have the discretion to unilaterally determine their work hours. These are the duties and responsibilities of the Executive Chef, not a cook.

Additionally, Plaintiff's imaginative argument that the kitchen employees were supervised by the CBA should be rejected. As Jorge Reyes and Wilmann Borgella testified, Plaintiff managed them and was their boss. (Trial Record ("TR") at 155:12-156:12; 222:3-222:4). Plaintiff would supervise their work by training them, monitoring them, and instructing them. While the CBA stated what the kitchen staff's general responsibilities were, it was Plaintiff's responsibility to ensure that the staff performed those duties effectively and efficiently on a daily basis. In other words, as discussed more fully below, it was Plaintiff, not the CBA, who regularly directed the work of the kitchen staff.

Next, Plaintiff's self-serving attempt to limit his responsibility for approving vacation requests to times when no F&B Manager was employed is not consistent with the record. The kitchen staff provided their vacation requests to Plaintiff, not the F&B manager. (TR at 228:5-228:9). When asked about the process for submitting vacation requests, Reyes testified:

> A First, you have to fill out a form and then you have to bring it to the Chef Mohamed.
> Q Why did you bring [it] to Chef Mohamed?
> A Because he was our manager; the kitchen's manager.

(TR at 166:10-166:14). Further, Salma Berrones, the HR Manager, testified that sometimes Plaintiff would approve requests without submitting the paperwork to her. (TR at 107:1-107:2). Nonetheless, Defendant's Trial Exhibit NN contains a number of vacation requests that were signed by Plaintiff during times when he, himself, has testified that there was a F&B Manager working in the hotel. *See* Defendant's Trial Exhibit ("Trial Exhibit") NN.

Similarly, Plaintiff's responsibility of writing the schedules was not a meaningless administrative task, as Plaintiff contends. Alfonso Cristobal, the Hotel Controller, testified that the schedules that Plaintiff wrote, and provided to the GM and HR, would be sent to him to create weekly labor forecasts. (TR at 255:11-259:19). Moreover, while the weekly schedules were generally similar, the schedules did change regularly and Plaintiff was responsible for making those changes. (TR at 70:15-71:15). As discussed above, when the kitchen staff submitted a vacation request to Plaintiff, Plaintiff was responsible for ensuring that the vacation time was accurately reflected on the schedule, and that another staff member was scheduled in place of the employee on leave. Likewise, if there was a special event taking place at the hotel, Plaintiff was responsible for finding cooks to work the event. *Id.* Additionally, when the kitchen staff called Plaintiff to inform him that they were sick and could not work, Plaintiff was responsible for finding another employee to work that shift. *Id.* Yes, the CBA establishes a seniority system to which

Plaintiff was required to adhere. However, the CBA does not contact employees to ask if they are available to cover for an absent employee, and it does not attend BEO meetings and contact staff to work banquets and other events, and it does not write the schedule to reflect those staffing changes once the staffing issues have been resolved. Those tasks were solely the responsibility of Plaintiff. (TR at 445:6-445:21).

Similarly, Plaintiff's attempt to minimize the significance of his responsibility for verifying the accuracy of payroll reports is unpersuasive. First, it is undisputed that Plaintiff was responsible for verifying the accuracy of the payroll punches for his department. Berrones testified that, as the department head for the kitchen, Plaintiff was responsible for confirming the accuracy of these reports, and that he would meet with her every Monday to discuss the punch reports and resolve any inconsistencies. (TR at 75:11-76:18). Second, it is also undisputed that Plaintiff was responsible for creating the daily tip reports. Specifically, Berrones testified that, "From when he was there, [Plaintiff] always did the payroll. He always did the payroll for the entire department and he also generated the tips for the employees." (TR at 77:10-12). Berrones clarified that Plaintiff would generate the tip reports for "[t]he front of the house, the bussers, the hostess and the bartenders, they get tips. They're tip employees so every week he has to submit the tip report to accounting and they verify the tips for the employees and then it comes back to HR to enter into payroll." (TR at 77:13-19). These payroll responsibilities are vital managerial tasks that Plaintiff performed on a regular basis. Had he not done so, the employees in his department would not have received proper compensation.

As Darin Miller, Defendant's VP of Operations testified, one of Plaintiff's "most important roles" was to prepare the kitchen for health inspections and to ensure that the hotel was running a clean and safe kitchen, restaurant, and overall operation. (TR at 356:17-22). Defendant offered

6

testimony from several witnesses addressing Plaintiff's role with respect to these inspections. Notably, Borgella testified that Plaintiff would instruct the kitchen staff on what needed to be done in order to pass inspections, such as, "Make sure that we keep our area clean, you know, make sure everything is proper, [neat]." (TR at 229:16-230:3). Reyes also testified that Plaintiff was responsible for instructing him what to clean in preparation for inspections, and that he would clean, "everything that is underneath; the floor, under the table, the top of the table, take out all the food in the fridge that was old or halfway decomposing or getting bad, and also clean the fridge." (TR at 167:12-15).

Plaintiff, as a department head, attended the weekly manager meetings. (TR at 67:5-12; 362:8-11). While this fact is undisputed, Plaintiff attempted to qualify this responsibility by claiming that he did not attend manager meetings if a F&B Manager was employed. (TR at 416:13-417:8). Plaintiff stuck to this story even when confronted with documentation demonstrating that he was at least at one manager meeting that was also attended by the F&B Manager, stating that the Meeting Minutes were wrong and that he was not present at the meeting. (TR at 460:3-460:24); *see also* Trial Exhibit FF.

Plaintiff's claim that he did not participate in the employee complaint and disciplinary process is also misplaced. Among other things, Reyes testified that he directed a union delegate to communicate to Plaintiff his complaint about a change in his work schedule. (TR at 159:17-160:7). As a result, Reyes' schedule was changed back to his old working schedule. (TR at 160:8-160:9). Additionally, Plaintiff described an incident in which the breakfast cook apologized to him for oversleeping and missing the beginning of his shift. (TR at 469:18-469:25). Moreover, Plaintiff could have, and indeed should have, disciplined union workers by providing verbal and then written warnings. (TR at 27:11-27:18); *see also* Trial Exhibit F at pp. 21-22. In fact, during a staff

meeting on June 17, 2015, GM Pierre Merhej instructed Plaintiff that he needed to "write up the staff." *See* Trial Exhibit P at 2. Thus, Plaintiff clearly was responsible for disciplining employees, he simply chose not to do it.

Plaintiff also played an "integral" role in menu pricing and determining the menu.  (TR at 349:3-349:19).  Miller testified that Plaintiff was a part of the collaborative process to determine the retail price of menu items by providing input regarding the market price of food.  (TR at 349:3-19).  Plaintiff's involvement included selecting new menu items, taking pictures of items, establishing pricing, and determining how the items would ultimately be prepared.  (TR at 363:11-364:7); *see also* Trial Exhibit FF. Moreover, Miller's testimony that there were restaurant menu changes during Plaintiff's employment was further supported by the testimony of Borgella and Reyes, who stated that, when the menu changed, Plaintiff would show how them how to present the new dish. (TR at 168:11-168:17; 231:17-232:9).

Finally, as is further discussed below, Plaintiff was responsible for ordering food, interviewing and hiring kitchen employees, and for supervising the work of the kitchen staff. Accordingly, it is evident that Plaintiff's primary job duty was management.

**(1)  The relative importance of Plaintiff's exempt duties far outweighs any other types of duties**

As set forth in this Court's Opinion and Order denying Defendant's motion for summary judgment:

> In determining whether an employee's managerial duties were more important to the defendant than the employee's nonmanagerial duties, courts in the Second Circuit have looked at whether the business could operate successfully without the employee performing the purported managerial functions. *See, e.g., Tamayo*, 2017 U.S. Dist. LEXIS 18102, 2017 WL 532460, at *6. In the context of a restaurant, '[t]he relative importance inquiry evaluates whether the restaurant[] could not operate successfully unless the purported managerial functions assigned to [the] Head Chef, such as determining amounts of food to be prepared, keeping track of inventory, and assigning employees to particular jobs, were performed.' *Id.*

Because the relative importance of an employee's exempt and nonexempt duties is a fact-specific inquiry, numerous courts have declined to make this determination at the summary-judgment stage. *See id.*; *see also Carhuapoma*, 2013 U.S. Dist. LEXIS 45886, 2013 WL 1285295, at *11 (citing *Indergit v. Rite Aid Corp.*, Nos. 08 Civ. 9361(PGG) and 08 Civ. 11364(PGG), 2010 U.S. Dist. LEXIS 32322, 2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010).

*Elghourab v. Vista JFK, LLC*, No. 17-cv-911 (ARR) (ST), No. 17-CV-00911 (ARR)(ST), 2018 U.S. Dist. LEXIS 200556, at *19-20 (E.D.N.Y. Nov. 27, 2018).

Here, Plaintiff alone was responsible for the important function of ordering food for the entire restaurant. (TR at 252:20-253:3).  This was not a responsibility that anyone else in the hotel performed. Moreover, contrary to Plaintiff's assertion, this was not a simple process of just walking into a freezer and checking off whether the food on hand matched a predetermined requirement. Instead, Plaintiff himself determined what and how much food was needed to operate the restaurant, to serve the staff, and to cater any banquets or other special events. (TR at 483:12-484:19). Plaintiff's testimony that this was a simple, routine process is contradicted by the testimony of each and every witness, including Plaintiff himself. That is, multiple witnesses testified to the erratic nature of Defendant's business, and how business demand was dependent on the frequency of "down flights."  Given this universal agreement as to the unpredictable nature of Defendant's business, Plaintiff's testimony that the critical job of ordering food for the entire hotel was merely a routine task is simply not credible. It was Plaintiff's responsibility to assess a host of variables and order the amount of food necessary to meet the hotel's needs, but not so much as to lead to excessive waste. (TR at 344:11-345:11; 348:13-349:2).

Without performing this function, along with the aforementioned duties of scheduling, verifying payroll, preparing the kitchen for inspections, and instructing the staff on a daily basis, the restaurant could not operate. In Plaintiff's Post-Trial Brief, he admits "taking inventory, ordering food, posting schedules, verifying hours for payroll, calculating tips, and attending

management meetings seem to be a vital importance to running a restaurant." *See* Doc. 63, Plaintiff's Post-Trial Brief, at p. 43. Yet, Plaintiff then attempts to minimize these important duties by attempting to portray them as purely ministerial. However, such a conclusion is simply not supported by the evidence, including Plaintiff's own testimony. Thus, there can be no dispute that Plaintiff performed important managerial functions on a regular basis, and that these responsibilities were the most important aspect of his work.

**(2) <u>The amount of time spent performing exempt work;</u>**

"The time an employee spends performing exempt work is an important but non-determinative factor in determining an employee's primary duty." *Ruggles v. Wellpoint, Inc.*, No. 08-CV-0201(LEK), 272 F.R.D. 320, 2011 U.S. Dist. LEXIS 17310, at *20 (N.D.N.Y Feb. 22, 2011) (*citing* 29 C.F.R. § 541.700(b) ("Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.")); *see also* Carhuapoma v. N.Y.-Presbyterian Healthcare Sys., 2013 U.S. Dist. LEXIS 45886, at *27 (S.D.N.Y. Mar. 29, 2013) (noting that exempt executives tend to have discretion over when they perform nonexempt duties and the ability to perform managerial and nonmanagerial duties concurrently); *Paganas v. Total Maint. Sol., LLC*, 220 F. Supp. 3d 247, 260 (E.D.N.Y. 2016) (holding that the plaintiff's supervision of employees and management was his primary duty although he claimed at trial that 90 percent of his work was non-supervisory physical cleaning).

As discussed in Defendant's Initial Brief, Plaintiff spent a majority of his time working in the kitchen performing his managerial responsibilities of supervising the kitchen staff. Plaintiff testified that it was the "chef's job" to ensure that the food was made correctly, and that if he saw one of the cooks doing something wrong, he would tell them, "don't do this again." (TR at 435:14-436:25). Moreover, the kitchen staff reported to Plaintiff and his responsibility was to be present

and provide instruction and occasional assistance when needed. (TR at 155:12-155:17, 222:18-223:7). When Plaintiff was not supervising the kitchen staff, Plaintiff worked in his office on his computer for at least two hours per shift. (TR at 154:17-155:1).

Moreover, even when Plaintiff occasionally performed nonexempt duties, he did so at his discretion. As discussed in more detail below, Plaintiff, himself, testified that he determined when he would assist the kitchen staff, who he would assist, and how he would assist them. (TR at 319:14-319:17, 467:22-468:8). Therefore, because Plaintiff had the discretion to determine when he performed the nonexempt work, this factor supports a finding that Plaintiff's primary duty was management. *See Carhuapoma*, 2013 U.S. Dist. LEXIS 45886 at *27.

Regardless, when an exempt employee occasionally performs nonexempt work, the focus is on whether the employee "remain[s] responsible for the success or failure of business operations under their management while performing the nonexempt work." 29 C.F.R. § 541.106(a). Because it is undeniable that Plaintiff was responsible for the success of the kitchen, and the restaurant as a whole, and had the autonomy to engage in nonexempt work at his discretion, this factor weighs in favor of Plaintiff's primary job duty being management.

**(3) Plaintiff performed his duties with relative freedom from direct supervision**

Throughout his employment, Plaintiff was relatively free from direct supervision. Indeed, Plaintiff, like all other managers in the hotel, reported only to the GM and did not have an intermediate supervisor who directly oversaw him or ensured that Plaintiff performed his duties. Plaintiff's claim to the contrary is discredited over and over again by each witness that testified at trial.

Plaintiff, himself, testified that he determined the hours he worked and would decide which employees to assist and how. (TR at 319:14-319:17, 467:22-468:8). Berrones testified Plaintiff

11

was the department head for the kitchen ("back of the house") while the F&B Manager was the department head for the front of the house. (TR at 76:15-76:24). At times when no F&B Manager was employed, Berrones and Miller testified that Plaintiff was the manager for both the kitchen and the front of the house. (TR at 76:15-76:24; 321:12-321:15). Moreover, Cristobal testified that Plaintiff had the sole discretion to purchase food for the restaurant and agreed that the food and beverage department "is given carte blanch to purchase whatever it needs to make sure that the restaurant has enough food and enough liquor." (TR at 247:7-12, 248:17-248:20, 253:20-253:24). Cristobal also testified that Plaintiff was responsible for reviewing the food inventory, making a decision as to what items were needed, and then ordering the food directly from the supplier. (TR at 252:20-253:3).

Finally, Plaintiff's attempt to claim that he received direct supervision from the CBA is unpersuasive. "[A]n employee can be exempt even if his discretion is "circumscribed" by a guidebook or supervisor, as long as, despite the circumscription, "judgments must still be made" by that employee." *Elghourab*, 2018 U.S. Dist. LEXIS 200556, at *18 (internal citations omitted). Here, the CBA is only a guidebook that outlines certain rules and procedures governing the work of union employees. It is not a sentient being, however, and did not control the everyday judgments Plaintiff was required to make in order to effectively perform his job duties.

Accordingly, the evidence establishes that Plaintiff performed his duties with relative freedom from direct supervision.

**(4)** **The relationship between the Plaintiff's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee**

As set forth in Defendant's Initial Brief, the proper method for analyzing the relationship between an employee's salary and the wages paid for the nonexempt work performed by the employee is comparing "the manager's weekly salary with the highest possible non-exempt

weekly wage … ." *Amash v. Home Depot U.S.A., Inc*., No. 1:12-cv-837, 2014 U.S. Dist. LEXIS 79761, at *17 (N.D.N.Y. June 12, 2014). Because Plaintiff's weekly salary was clearly greater than that of other employees, this factor weighs in favor of Plaintiff's primary job duty being management.

However, assuming the Court instead reduces Plaintiff's weekly salary to an hourly rate of pay based on the actual number of hours worked, he still likely earned more per hour than other employees. *See Tamayo*, 2017 U.S. Dist. LEXIS 18102, 2017 WL 532460, at *9.

### i.    Plaintiff worked approximately 50 hours per week throughout his employment

If, as here, an employee offers testimonial evidence to establish the hours they allegedly worked, an employer may "come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Yu Y. Ho v. Sim Enterps., Inc.*, No. 11 CV 2855, 2014 U.S. Dist. LEXIS 66408, 2014 WL 1998237, at *14 (S.D.N.Y. May 14, 2014) (citing *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 688-89, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946)).

Here, Plaintiff's testimony is full of logical inconsistencies that negate the reasonableness of any inferences to be drawn from his testimony. It is strikingly evident from Plaintiff's exaggerations that he is embellishing about the amount of actual hours he claims to have worked.

Plaintiff testified at trial that from 2011 to 2014, he worked six (6) days a week from 6:00 a.m. to 7:30 p.m. (minimum of 81 hours per week).  (TR at 372:3-372:5). From March 2014 to March 2015, Plaintiff alleges he worked five (5) days per week, from 6:00 or 7:00 a.m. to 7:00 or 8:00 p.m. (minimum of 60 hours per week), because there was a F&B Manager. (TR at 373:7-373:10. 374:1-374:24).  From March 2015 to February 2016, Plaintiff alleges that he worked seven (7) days per week, from 6:00 a.m. to 8:00 or 9:00 p.m. (minimum of 91 hours a week), because

13

there was no F&B Manager. (TR at 375:16-375:25). Finally, from February 2016 to September 2016, Plaintiff alleges that he worked five (5) days per week, from 6:00 a.m. to 4:00 or 5:00 p.m. (minimum of 50 hours a week), because there was a F&B Manager employed at the hotel. (TR at 376:4-376:10).

There is a plethora of inconsistencies in Plaintiff's crafted narrative. First, as argued in Defendant's Initial Brief, given Plaintiff's claim that he was not a manager, there is absolutely no reason why his hours should have been so drastically affected by the presence or absence of another manager. Again, there is no evidence suggesting that the F&B Manager ever worked in the kitchen or assisted with food preparation or cooking, so, if Plaintiff was merely a cook, the presence of a F&B Manager should have had little to no effect on the amount of work Plaintiff was required to perform, and it certainly should not have resulted in his hours being cut nearly in half.

Second, Plaintiff alleged that he did not perform managerial duties from 2011 to 2013 because Amr was employed as the F&B Manager. (TR at 413:24-413:25). However, by his account, the presence of a F&B Manager also should have meant that he worked fewer hours, but Plaintiff claims that he worked a minimum of 81 hours per week during this time period. (TR at 372:3-372:5).

Third, Plaintiff's claim that he regularly began work at 6:00 a.m. is contradicted by his own subsequent testimony. That is, Plaintiff testified that there were times when he came in at noon, and the one schedule admitted into evidence has Plaintiff arriving at noon two days per week. (TR at 472:11-472:16); *see also* Trial Exhibit MM. Given these significant inconsistencies and variations, Plaintiff's testimony regarding his hours worked should be afforded little weight.

Accordingly, the evidence at trial, including Plaintiff's own testimony, negates the reasonableness of the inference that Plaintiff worked as much as 98 hours per week. Rather, the

far more reasonable inference, and the one actually supported by the record, is that Plaintiff

worked, on average, approximately fifty (50) hours per week.

ii. **Plaintiff earned more per hour than other kitchen staff**

Because Plaintiff's approximate hours worked were fifty (50) hours per week, Plaintiff's

hourly rate was greater than that of other kitchen employees. Plaintiff testified that his initial salary

was $55,000, which he received until 2014. (TR at 371:12-17). Plaintiff testified that, in 2014, his

salary increased to $65,000, and then increased again to $69,000 in or about February or March

2016. (TR at 371:12-371:23). Plaintiff further testified that he took one two (2) week vacation in

2013 and another in 2015. (TR at 37:5-375:16).

Inferring that Plaintiff took at least a two week vacation every year, this would equate to

Plaintiff earning an hourly rate of $22.00[1] per hour from 2011 to 2014, $26.00[2] per hour from 2014

to February 2016, and $27.60[3] from February 2016 to the end of his employment. While this hourly

rate was slightly lower than that of Jorge Reyes in 2013, Plaintiff's hourly rate exceeded that of

Reyes and every other kitchen employee for the years 2014, 2015, and 2016. During the same

period of time, Jorge Reyes' hourly rate was less than Plaintiff's in 2014, 2015 and 2016. *See*

Plaintiff's Trial Exhibits 7-23. Thus, although it is a close call, Plaintiff still earned more per hour

than the cook with the most seniority, Jorge Reyes.[4]  Thus, this factor also weighs in favor of a

finding that Plaintiff's primary duty was management.

B. **Plaintiff Regularly Directed The Work Of Two Or More Employees**

The third prong of the executive exemption analysis requires that the employee must

---

[1] ($55,000 / (52-2) weeks) / 50 hours per week = $22.00 per hour.
[2] ($65,000 / (52-2) weeks) / 50 hours per week = $26.00 per hour.
[3] ($69,000 / (52-2) weeks) / 50 hours per week = $27.60 per hour.
[4] Reyes earned $25.65 per hour in 2012, 2013, 2014 and 2015, earned $26.16 per hour in 2016, and earned $26.62 starting in July 2016.

customarily and regularly direct the work of at least two or more other full-time employees or their

equivalent. 29 C.F.R. 541.100(a)(3). Moreover, the regulations define "customarily and regularly"

as a "frequency that must be greater than occasional" but "may be less than constant." Such work

is performed "normally and recurrently" every work week, and excludes "isolated or one-time

tasks." *Mullins v. City of N.Y.*, 523 F. Supp. 2d 339, 353 (S.D.N.Y. 2007).

When addressing Defendant's motion for summary judgment, this Court noted that

"defendant [had] offered no testimony of restaurant employees and no concrete examples of

[Plaintiff] directing the work of restaurant employees." *Elghourab*, 2018 U.S. Dist. LEXIS

200556, at \*24. Cognizant of this warning, at trial, Defendant offered the testimony of Jorge Reyes

and Wilmann Borgella, the two most senior cooks in the kitchen, who testified that Plaintiff

regularly directed their work and that of the other kitchen staff. (TR at 154:5-156:13; 222:3-

223:16). Specifically, when asked how Plaintiff supervised his work, Reyes stated:

> Well, it was a down flight, for example, whatever I have to send to the front, he
> was telling me you better send this, and send that, and do it this way or that way.
> And if it was a party, he would give me the paperwork to know what I have to
> prepare and cook.

(TR at 156:9-13).  Reyes later testified that Plaintiff would instruct him which food to serve and

in what manner.  (TR at 156:4-13). Reyes also testified that Plaintiff would instruct him what areas

of the kitchen needed to be cleaned in preparation for upcoming inspections. (TR at 167:4-10).

Reyes further testified that Plaintiff would instruct him what sandwiches and salads to prepare for

sale in the galley, and how to present new items on the menu.  (TR at 172:15-22; 168:11-17).

When also asked how Plaintiff would supervise his work, Borgella testified that, in the

kitchen, "[Plaintiff's] the one to tell me what to do, how to fix it." (TR at 223:19-21). Borgella

further testified that Plaintiff would instruct him what to prepare for the employee lunch, what

food to prepare for the buffet during a down flight, and how to make the sandwiches and salads to

16

be served in the restaurant galley. (TR at 230:11-21; 195:1-17; 236:20-237:3). Borgella also testified that Plaintiff would instruct him on proper food presentation, and that, when new menu items were added, Plaintiff would instruct him how to prepare and present them.  (TR at 232:1-233:22). Finally, Plaintiff would instruct Borgella and other staff what needed to be cleaned in preparation of corporate and health inspections. (TR at 229:16-230:5).

Plaintiff also hinted that he was respected by his staff more than other managers because he dressed like a cook and treated his staff more like friends than as a boss. (TR at 470:23-470:24). Furthermore, at a manager meeting on July 20, 2016, Plaintiff stated he would conduct more trainings of staff and pictures would be taken so that the presentation of the food is consistent with every cook. (TR at 462:1-462:14); *see also* Trial Exhibit FF.

Thus, at trial, Defendant established this prong of the executive exemption by demonstrating, with concrete examples, that Plaintiff regularly directed the work of two or more employees.

C. **Plaintiff's Recommendations With Respect to Hiring Were Given Particular Weight**

The final prong of the executive exemption is met because Plaintiff's recommendations with respect to hiring were afforded particular weight. Berrones testified that Plaintiff, as Executive Chef, was responsible for hiring kitchen staff when there was a position available or when there was a need for a substitute worker. (TR at 78:3-10). When a vacancy existed, Plaintiff would notify Berrones who would then notify the union. (TR at 78:3-20). The union would then send over candidates, Plaintiff would interview them and then he would let Berrones know if he wanted to hire them. (TR at 78:3-79:1). This occurred with Jawainte Singh (dishwasher) and Mohamad Hizam (substitute cook). (TR at 80:3-80:11; 438:11-439:4; 96:3-96:15, 440:22-441:8).

Plaintiff also confirmed that he met with Jaiwante Singh and took her to HR to be hired.

(TR at 438:2-439:4). Notably, while Plaintiff claimed that he did not ask her any questions and did not "interview" her, he then proceeded to list the questions he asked her, including if she was a good worker and wanted to work. (TR at 438:2-439:4). Plaintiff also testified to selecting Mohamed Hizam to work as a substitute cook. (TR at 424:19-425:17). Specifically, Plaintiff stated that the union sent over two candidates, and he selected Hizam for the position. (TR at 424:19-425:17; 441:16-442:8). Moreover, these were the only two individuals hired in the kitchen during Plaintiff's employment, and the record clearly establishes that Plaintiff was instrumental in both of those hirings. (TR at 442:9-12).

Thus, Defendant has met its burden of establishing that Plaintiff was exempt under the executive exemption to the FLSA and NYLL.

### III.    Plaintiff's Statutory Wage Notice Claim Under NYLL § 195(1) Fails

As argued in Defendant's Initial Brief, there is no liability under NYLL § 195(1) where an employee has timely received all pay owed to him. *See* NYLL § 198(1-b). Therefore, even if Plaintiff was not provided a wage notice as alleged, Defendant cannot be held liable for any notice violation because Plaintiff has admitted that he was always paid on time for the correct amount.

### IV.    Plaintiff's Actual Hours Worked Are Approximately 50 Hours Per Week

As discussed herein, Plaintiff was an exempt employee and is not entitled to overtime under the FLSA or the NYLL. Nonetheless, should this Court conclude that Plaintiff was a non-exempt employee, he should not be able to recover for his grossly inflated estimation of his hours actually worked. Rather, a far more reasonable estimation, and one that is consistent with the testimony and evidence presented at trial, is that Plaintiff worked approximately fifty (50) hours per week, and can therefore recover, at most, the equivalent of ten (10) overtime hours per week.

18

## V.     Plaintiff Is Not Entitled To Liquidated Damages

Courts have discretion to deny an award of liquidated damages where the employer shows that, despite the failure to pay appropriate wages, the employer acted in subjective "good faith" and had objectively "reasonable grounds" for believing that the acts or omissions giving rise to the failure did not violate the FLSA. 29 U.S.C. § 260 (1994).

Here, Miller testified that when determining whether the executive chef position was exempt, the company consulted internally about the management positions to determine whether it was exempt. (TR at 289:25-29:5). Included in that decision making was Laurie Nagle, the former corporate HR head, who helped determine that the executive chef position was exempt. (TR at 286:23-286:24). Miller further testified that there were several reasons why the Executive Chef position was an exempt salary position. Specifically, Miller highlighted that the Executive Chef position is customarily viewed as exempt and company and industry standards support Defendant's classification of the position as exempt. (TR at 289:7-289:13; 292:25-293:4).

Therefore, because Defendant has demonstrated that it has acted in good faith with respect to classifying Plaintiff as exempt, should Plaintiff be entitled to overtime, Plaintiff would not be entitled to liquidated damages.

## VI.     Plaintiff Is Not Entitled To Prejudgment Interest Under The NYLL

It is "well settled" that pre-judgment interest is not recoverable under the FLSA. *Begum v. Ariba Disc., Inc*., No. 12 Civ. 6620 (DLC), 2015 U.S. Dist. LEXIS 5598, 2015 WL 223780, at *6-7 (S.D.N.Y. Jan. 16, 2015). Conversely, "the NYLL permits the award of both liquidated damages and pre-judgment interest." *Fermin v. Las Delicias Peruanas Rest., Inc*., 93 F. Supp. 3d 19, 38 (E.D.N.Y. 2015). Under the N.Y.C.P.L.R., "[i]nterest shall be at the rate of nine per centum per annum." N.Y.C.P.L.R. § 5004. Courts typically use the "midpoint of the accrual of damages"

method to calculate interest. *See, e.g.*, *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 342 (S.D.N.Y. 2005). "In exercising its discretion, the Court uses the midpoint between the start and end dates of Plaintiff's employment." *Cavalotti v. Daddyo's BBQ, Inc.*, 2018 U.S. Dist. LEXIS 154918, at *51-52 (E.D.N.Y. Sep. 8, 2018) (citations omitted).

Here, Plaintiff is not permitted to recover prejudgment interest under the FLSA. Knowing this, Plaintiff requests an award of liquidated damages under the NYLL so that he can recover both prejudgment interest and liquidated damages under the NYLL. This argument should be rejected because the result is inequitable. Plaintiff choose to assert FLSA claims and now cannot reject those claims so that he can recover a windfall in his favor. Thus, in the event that damages are awarded, Plaintiff is not entitled to prejudgment interest under the FLSA and NYLL.

<u>CONCLUSION</u>

Accordingly, Defendant respectfully requests a judgment against Plaintiff dismissing the Complaint, awarding Defendant attorneys' fees, awarding Defendant costs of suit, and providing any other equitable relief deemed appropriate by the Court.

Dated:     New York, New York
           June 3, 2019

Respectfully submitted,

GORDON REES SCULLY
MANSUKHANI, LLP

By:   /s/ Alex D. Dumas
      Christopher A. Seacord
      Alex D. Dumas
      1 Battery Park Plaza, 28th Floor
      New York, New York 10004
      Tel: (212) 269-5500

20

Fax: (212) 269-5505
cseacord@grsm.com
adumas@grsm.com

*Attorneys for Defendant*
*Vista JFK, LLC*