UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Mohamed Elghourab,<br><br>            Plaintiff,<br><br>            v.<br><br>Vista JFK, LLC,<br><br>            Defendant. | **17-cv-911 (ARR) (ST)**<br><br>**Opinion & Order**<br><br>**Not for publication** |

ROSS, United States District Judge:

This is an action by Mohamed Elghourab ("plaintiff" or "Elghourab") for unpaid overtime wages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the New York Labor Law ("NYLL"). Plaintiff was employed as a chef at a hotel restaurant owned by defendant Vista JFK, LLC ("defendant" or "Vista JFK"). On July 27, 2018, defendant moved for summary judgment on the ground that plaintiff is exempt from receiving overtime payments under the executive exemption to the FLSA. The question of whether Elghourab is an exempt executive turns on whether he was a manager responsible for overseeing the kitchen and its employees. On November 27, 2018, I denied defendant's motion for summary judgment, concluding that factual disputes precluded a determination that Elghourab fell under the executive exemption as a matter of law. On May 21 and May 22, 2019, I held a bench trial to determine defendant's liability, if any. After careful consideration of the evidence introduced at trial and the relevant law, I find that plaintiff does not qualify as an exempt executive and is therefore entitled to relief.

## I.    Findings of Fact[1]

### A.  Defendant's Operations

Defendant's hotel, which is located near John F. Kennedy International Airport ("JFK"),

caters to passengers traveling through JFK. *See* Pl.'s Trial Br. 3, ECF No. 63.[2] The food-and-

beverage ("F&B") department at the hotel consists of the restaurant dining area ("front of the

house") and the restaurant kitchen ("back of the house"). *See* Pl.'s Trial Br. Ex. 24, at 23:19–

24:3, ECF No. 63-26 ("Berrones Testimony"); Pl.'s Trial Br. Ex. 24, at 190:4–8 ("Borgella

Testimony"). The bussers, cashiers, and bartenders constitute the front-of-the-house employees,

while the cooks and dishwashers constitute the back-of-the-house employees. *See* Berrones

Testimony at 23:19–24:3. The restaurant serves a breakfast buffet from 6:00am to 11:00am, an a

la carte lunch from 12:00pm to 1:30pm, and an a la carte dinner from 5:00pm to 11:00pm. *See*

Berrones Testimony at 38:8–39:1; Pl.'s Trial Br. Ex. 24, at 135:25–136:1 ("Reyes Testimony");

Borgella Testimony at 208:21–22; Pl.'s Trial Br. Ex. 25, at 322:14–17, ECF No. 63-27 ("Miller

Testimony"). The kitchen also provides a daily employee lunch. *See* Borgella Testimony at

230:6–7; Reyes Testimony at 130:1–3.

Defendant gets most of its business from travelers whose flights have been cancelled. *See*

Berrones Testimony at 41:12–15; *see also* Pl.'s Trial Br. Ex. 25, at 379:12–380:1, 463:2–9

("Elghourab Testimony"); Miller Testimony at 302:11–23. These cancelled flights are called

"down flights." *See* Miller Testimony at 302:24–303:11. Whenever there is a down flight, the

restaurant also prepares a lunch or dinner buffet, which could result in the restaurant opening

---

[1] Because I found plaintiff to be the most credible witness, I rely on his testimony in large part.

[2] Vista JFK is the legal entity that owns and operates the hotel. The hotel was a Double Tree by Hilton until October 2013, at which point it became a Radisson. *See* Pl.'s Trial Br. 3.

earlier or closing later than scheduled. *See* Berrones Testimony at 41:16–19, 43:3–12; Borgella

Testimony at 201:19–24; Miller Testimony at 322:18–20; Elghourab Testimony at 390:20–

391:12. Down flights bring in approximately 160 guests. *See* Elghourab Testimony at 389:5–6.

During plaintiff's employment, down flights occurred between two and seven times per week.

*See* Elghourab Testimony at 378:24–379:4, 390:20–391:12; *see also* Reyes Testimony at

172:25–173:3.[3] The hotel also has a banquet hall, where it holds events as often as once per

week. *See* Berrones Testimony at 71:7–8, 92:14–16; Elghourab Testimony at 396:2–4. These

events include weddings, birthdays, and religious gatherings. *See* Elghourab Testimony 396:5–

17. The evening events conclude around 12:00am. *See id.* at 473:4–6.

　　During plaintiff's employment, there were only two non-union employees in the F&B

department—plaintiff and the F&B manager. *See* Berrones Testimony at 9:8–19. Though some

of defendant's witnesses testified to the contrary, I credit plaintiff's testimony that when an F&B

manager was employed, the F&B manager supervised plaintiff and oversaw the entire F&B

department. *See* Elghourab Testimony at 399:2–8. The F&B manager reported directly to the

hotel's general manager ("GM"). *See* Miller Testimony at 337:11–22. There were several F&B

managers throughout plaintiff's employment, though defendant has not provided any evidence

regarding their dates of employment. I credit plaintiff's testimony that Amr was the F&B

manager from the beginning of plaintiff's employment in 2011 until 2013 and that numerous

F&B managers were employed after Amr, including Hany, Rafael, Tony, Angela, Robert, and

Ram. *See* Elghourab Testimony at 399:19–403:3; *see also* Miller Testimony at 330:5–332:2.

---

[3] Between 2011 and 2015, there were down flights that resulted in customers coming to the hotel almost daily;
however, in 2016, two other hotels opened close by and business slowed. *See* Elghourab Testimony at 378:24–
379:4, 463:18–25, 472:2–6.

There was no F&B manager for most of 2015, during which time both plaintiff and the GM assumed a bigger role in the F&B department. *See* Elghourab Testimony at 416:3–8, 487:6–13. Darin Miller, the Vice President of Operations for Vista Hospitality LLC, served as the hotel's acting GM for a few weeks at the end of 2015, when there was a gap between GMs. *See* Elghourab Testimony at 377:11–378:15, 447:17–448:8.[4]

A collective-bargaining agreement ("CBA") and memorandum of understanding ("MOU") between Vista JFK and the New York Hotel and Motel Trades Council, AFL–CIO ("union") govern various aspects of the union members' employment with defendant. The CBA and MOU control hourly pay rates and pay increases;[5] the hours and shifts that employees work;[6] hiring practices;[7] and job duties and responsibilities.[8] Union employees work seven-hour shifts with a 30-minute break, and they work 35 hours per week. *See* Berrones Testimony at 36:17–37:7; Reyes Testimony at 123:22–124:10; Miller Testimony at 310:5–12. If they work

---

[4] While Mr. Miller testified that he served as the hotel's acting GM on several occasions during plaintiff's employment, I do not find his testimony credible. Mr. Miller did not mention his role as acting GM during his deposition, and he provided no dates, specifics, or records to support his trial testimony. *See, e.g.*, Miller Testimony at 282:1–285:6, 295:4–299:15. Further, Jorge Reyes, who has been employed as a cook in defendant's restaurant for 18 years, testified that he did not even know who Mr. Miller was. *See* Reyes Testimony at 118:5–23. I thus credit plaintiff's testimony that Mr. Miller only served as the hotel's acting GM once, when plaintiff was on one of the two vacations he took during his five years of employment. *See* Elghourab Testimony at 377:11–378:15, 447:17–448:8; *see also id.* at 372:22–373:6, 375:5–15.

[5] *See* Berrones Testimony at 22:18–24, 35:5–11, 54:25–55:5; Miller Testimony at 305:20–307:3.

[6] *See* Miller Testimony at 309:3–10. Almost all of the restaurant employees who worked with plaintiff were hired before plaintiff, including the two employees who testified at trial. *See* Pl.'s Trial Br. 12. For example, Jorge Reyes has been working as a lunch cook at the hotel for 18 years. *See* Reyes Testimony at 118:19–23. He has worked the 8:00am to 3:30pm shift the entire time, except that his shift was pushed back briefly approximately seven years ago; after he complained to his union delegate, his schedule was immediately changed back. *See id.* at 146:17–147:3, 159:6–15, 160:3–9. Wilmann Borgella has been employed as a cook since 2004 or 2005. *See* Borgella Testimony at 182:25–183:9. He has had the same schedule for the past five or six years, i.e., Tuesdays–Fridays 4:00pm to 11:30pm and Saturdays 8:00am to 3:30pm. *See id.* at 183:10–20. He has always worked four night shifts and one morning shift. *See id.* at 183:21–184:3.

[7] *See* Berrones Testimony at 49:7–18; Elghourab Testimony at 418:19–421:8.

[8] *See* Berrones Testimony at 23:14–25:18.

more than 35 hours, they get paid time-and-a-half. *See* Berrones Testimony 36:17–37:7; Reyes Testimony 123:22–124:10; Miller Testimony at 310:5–12. Overtime is offered to union employees based on a seniority system. *See* Berrones Testimony at 37:8–22, 38:3–7; Miller Testimony at 310:20–311:12. When plaintiff was employed, the union members also selected their vacation days based on seniority. *See* Elghourab Testimony at 413:21–415:4; *see also* Reyes Testimony at 133:20–134:4 (testifying that he receives four weeks of paid vacation per year); Borgella Testimony at 209:15–16 (testifying that he receives 15 days of paid vacation per year). There is a union delegate on every shift in the F&B department, and union complaints go through that union delegate. *See* Berrones Testimony at 21:24–22:4, 30:12–14, 46:11–17; Reyes Testimony at 133:14–19, 159:13–15; Borgella Testimony at 196:6–25. Under the CBA, non-union employees are not permitted to perform union work, and if a union employee learns that a non-union employee has performed union work, he can file a complaint and receive compensation. *See* Berrones Testimony at 81:20–82:14; Miller Testimony at 351:8–354:5.[9]

### B. Elghourab's Role at Vista JFK

Elghourab, who has a high school education and no formal culinary training, was hired in September 2011 to work as a chef in defendant's hotel restaurant. *See* Pl.'s Trial Br. 7; Def.'s Trial Br. 1, ECF No. 64; Elghourab Testimony at 370:21–371:9. Plaintiff remained employed by defendant until September 2016. *See* Pl.'s Trial Br. 7; Def.'s Trial Br. 1; Elghourab Testimony at 371:4–7.

---

[9] Defendant appears to rely on this provision of the CBA to demonstrate that plaintiff did not perform union tasks, such as cooking, washing dishes, and bussing tables. *See, e.g.*, Def.'s Trial Br. 4, 11, ECF No. 64. Like the job description discussed *infra* n.13, the CBA is probative only insofar as it reflects how the hotel actually functioned in practice. Here, the evidence before me indicates that plaintiff did indeed perform a substantial amount of union work. Thus, I do not find defendant's argument compelling.

### i. Salary

Elghourab's starting annual salary was $55,000. *See* Pl.'s Trial Br. 44; Def.'s Trial Br.

16. His salary was increased to $65,000 in 2014 and $69,000 in 2016. *See* Pl.'s Trial Br. 44;

Def.'s Trial Br. 16. It is undisputed that plaintiff did not receive overtime. When plaintiff was

employed, the hourly wages of his union co-workers were as follows:

> Mr. Reyes earned $25.65 per hour ($38.47 for overtime in excess of
> 35 hours per week) in 2012, 2013, 2014, and 2015, $26.16 ($39.24)
> per hour in 2016, and $26.62 ($39.93) per hour starting in July 2016.
> Mr. Borgella earned $24.08 ($36.12) per hour in 2013 [and] 2014,
> $24.56 ($36.84) per hour starting in July 2015, and $24.99 ($37.49)
> per hour starting in July 2016. [Breakfast chef Angel] Inamagua
> earned $25.04 ($37.56) per hour in 2012, 2013, and 2014, $26.43
> ($39.64) per hour starting in March 2015, and $26.89 ($40.34) per
> hour starting in July 2016. [Dinner chef Teresa] Bravo earned
> $24.08 ($36.12) and then $24.56 ($36.84) per hour in 2015 and
> $24.99 ($37.49) per hour in 2016. [Dishwasher Eddy] Abreu earned
> $22.33 ($33.49) per hour in 2013 and 2014, $22.78 ($34.16) per
> hour starting in July 2015, and $23.18 ($34.76) per hour starting in
> July 2016.

Pl.'s Trial Br. 45–46 (citations omitted) (citing payroll registers).

### ii. Hours

Plaintiff's credible testimony, corroborated by the testimony of defendant's witnesses,

supports the conclusion that he worked 67.5–98 hours per week, with the exception of the end of

2016, when he worked 50 hours per week.[10] From September 2011 until March 2014, plaintiff

---

[10] Because defendant did not document plaintiff's hours, there is nothing in the record to prove how many hours
Elghourab worked other than his own recollection and estimates. "It is well-settled that when an employer fails to
keep adequate records of its employees' compensable work periods, as required under the FLSA, employees seeking
recovery for overdue wages will not be penalized due to their employer's record-keeping default." *Reich v. S. New
Eng. Telecomms. Corp.*, 121 F.3d 58, 69 (2d Cir. 1997). Accordingly, "in such cases, employees need only . . .
produce 'sufficient evidence to show the amount and extent of [compensable] work as a matter of just and
reasonable inference.'" *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). The Second
Circuit has confirmed that "it is possible for a plaintiff to meet this burden through estimates based on his own
recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011). Once a plaintiff has done so, "[t]he
burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with
evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *S. New Eng.*,
121 F.3d at 67 (quoting *Mt. Clemens*, 328 U.S. at 687–88). In this case, plaintiff has met his burden of providing

worked six days per week, and he worked from approximately 6:00am until 7:30pm or 8:00pm, sometimes later. *See* Elghourab Testimony at 372:1–19; *see also* Reyes Testimony at 136:25–137:15 (testifying that plaintiff worked a lot, sometimes arriving before Reyes' shift began at 8:00am and always working after Reyes ended his shift at 3:00pm); Borgella Testimony at 198:9–25, 216:14–217:5 (testifying that when he worked the 4:00pm to 11:30pm shift and the 8:00am to 3:30pm shift, plaintiff was frequently at work when he arrived and when he left). Assuming, conservatively, that plaintiff's hours were 6:00am to 7:30pm, he was working 81 hours per week at a rate of $13.05 per hour. *See* Pl.'s Br. 44 & n.206.[11] Between March 2014 and March 2015, plaintiff worked the same hours five days per week. *See* Elghourab Testimony at 373:7–375:1. Thus, he worked an average of 67.5 hours per week at a rate of $15.67 per hour. *See* Pl.'s Br. 44 & n.207. From March 2015 until February 2016, plaintiff worked six or seven days per week from approximately 6:00am until 8:00pm or 9:00pm. *See* Elghourab Testimony at 375:16–25; *see also* Berrones Testimony at 15:7–15 (estimating that plaintiff began his work day at 6:00am or 7:00am); Reyes Testimony at 150:3–8 (testifying that plaintiff was always at work Monday through Friday and was sometimes at work over the weekend when Reyes was working overtime). Assuming, again conservatively, that plaintiff's hours were 6:00am to 8:00pm seven days per week, he was working an average of 98 hours per week. Thus, he was making $10.79 per hour before he received his raise, and $12.76 per hour after he received his raise. *See* Pl.'s Br. 44 & nn.208–209. From February 2016 until the end of his employment in September 2016, plaintiff worked five days per week from approximately 6:00am until 4:00pm. *See* Elghourab

---

credible estimates based on his own recollection, and I do not find that defendant has come forward with evidence that negates the reasonableness of plaintiff's estimations. Accordingly, I rely on plaintiff's testimony.

[11] These hours are conservative because on days where there were down flights, plaintiff would often work until 9:00pm or 10:00pm, *see* Elghourab Testimony at 374:15–24, and when there were banquets, plaintiff would work until midnight, *see id.* at 473:2–6; *see also* Borgella Testimony at 198:13–25, 219:18–21 (testifying that he routinely witnessed plaintiff working as late as 11:00pm or 11:30pm and that plaintiff rarely left before him).

Testimony at 376:4–10. He was therefore working about 50 hours per week at an hourly rate of

$26.54. *See* Pl.'s Br. 44–45 & n.210. Plaintiff almost never received holidays off. *See* Elghourab

Testimony at 372:20–21, 374:25–375:1, 376:22–23. He took one two-week vacation in 2013 and

another two-week vacation in December 2015. *See id.* at 372:22–373:6, 372:5–15. Because

defendant did not maintain time records for plaintiff, neither Berrones nor Miller was able to

testify as to the number of hours plaintiff worked each week. *See* Berrones Testimony at 16:15–

17:7; Miller Testimony at 319:14–320:6.

### iii.   Responsibilities

#### 1.   Daily Responsibilities[12]

Plaintiff never received a written job description. *See* Elghourab Testimony at 371:10–11;

*see also* Berrones Testimony at 14:18–23, 17:13–16.[13] Plaintiff's typical day proceeded as

follows. When he arrived at work at 6:00am, he would wash dishes from the night before, since

the dishwasher did not arrive until 7:00am and he needed clean dishes for the hotel's breakfast

guests. *See* Elghourab Testimony at 380:4–20. Next, plaintiff would help prepare and serve

breakfast, as there were often down flights, creating too many guests for the one breakfast chef to

handle on his own. *See id.* at 380:20–383:16. Plaintiff's activities included gathering and cooking

buffet items such as potatoes, French toast, bacon, and eggs; cleaning and cutting fruit; carrying

---

[12] Salma Berrones, defendant's Human Resources manager, and Darin Miller, the Vice President of Operations for Vista Hospitality LLC, both testified as to plaintiff's daily activities. As Ms. Berrones admitted at trial, however, she did not spend time in the kitchen observing plaintiff's day-to-day work. *See* Berrones Testimony at 18:1–20, 99:6–23, 114:19–115:9. As discussed *supra* n.4, I do not find Mr. Miller's testimony that he frequently served as the hotel's acting GM credible. Further, as Miller testified at trial, his office is located in Binghamton, New York, and during plaintiff's employment, he visited defendant's hotel on average once per month. *See* Miller Testimony at 282:13–283:3, 285:25–286:7; *see also* Elghourab Testimony at 377:16–23. Thus, I rely on plaintiff's credible testimony, as well as the testimony of the kitchen employees, to determine plaintiff's daily activities.

[13] At trial, I reserved my ruling on the admissibility of the Executive Chef job description. *See* Berrones Testimony at 90:3–11. I conclude that it is inadmissible; however, to the extent that it is admissible, it is not probative because I do not find that it accurately reflects plaintiff's job duties. *See Carhuapoma v. N.Y.-Presbyterian Healthcare Sys., Inc.*, No. 11 Civ. 8670(JPO)(RLE), 2013 WL 1285295, at *3 n.3 (S.D.N.Y. Mar. 29, 2013) ("A job description is probative evidence, but only to the extent that it reflects an employee's actual duties.")

trays to and from the buffet; bringing plates and silverware out to the guests; and helping to bus tables. *See id.*; *see also* Miller Testimony at 322:5–323:2.

When breakfast closed at 11:00am, plaintiff would help clean up. *See* Elghourab Testimony at 387:20–23. If there was no down flight, plaintiff would order food, stock and clean the walk-in refrigerator, and take out garbage. *See id.* at 387:20–24, 389:18–390:19. If there was a down flight, however, plaintiff would help prepare the lunch buffet by cooking, filling ice, changing gas tanks, stocking soda, carrying trays back and forth from the buffet, helping with plates and silverware, and bussing tables. *See id.* at 388:24–390:19, 391:13–392:21; *see also* Reyes Testimony at 148:7–149:20 (testifying that when the restaurant was busy plaintiff would carry trays, plates, and utensils to the buffet, as well as clear tables); Borgella Testimony at 206:17–207:24 (testifying that plaintiff helped cook food for the customers when there were down flights).

Between 2:00pm and 4:30pm, if there was no down flight, the restaurant was closed, so plaintiff would begin preparing items for the dinner menu. *See* Elghourab Testimony at 394:11–395:19 (testifying that he would prepare the dinner food for Mr. Borgella by cleaning and marinating the chicken, slicing tomatoes, and gathering ingredients from the freezer); Borgella Testimony at 204:14–21 (testifying that plaintiff would sometimes do prep work for dinner before he arrived). If there was a down flight, however, plaintiff would prepare the dinner buffet. *See* Elghourab Testimony at 395:10–12, 397:8–398:8; Borgella Testimony at 206:7–207:24, 208:10–20. Between when Mr. Reyes stopped working at 3:00pm and Mr. Borgella arrived at 4:00pm or 4:30pm, plaintiff was the only chef in the kitchen, so if a down flight came in, Elghourab had to prepare much of the buffet by himself. *See* Elghourab Testimony at 395:10–12, 397:8–398:8; Borgella Testimony at 206:7–207:24, 208:10–20; *see also* Elghourab Testimony at

393:24–394:10; Reyes Testimony at 121:15–25. After 4:30pm, if there was a down flight, plaintiff would help the dinner chefs prepare and serve the dinner buffet. *See* Elghourab Testimony at 395:10–12, 397:8–398:18; Borgella Testimony at 206:7–207:24. If there was a banquet, plaintiff would help cook the food for the event. *See* Elghourab Testimony at 393:18–22.

### 2.   Management Responsibilities

There is no dispute that plaintiff was responsible for ordering food for the hotel. *See* Pl.'s Trial Br. 17–18 ("Twice a week, Plaintiff ordered food for the hotel. . . . [H]e would be the person who would notice if the stock of a perishable food was low. Plaintiff . . . would then call the only supplier the hotel used, US Food, and place a bulk order to make sure there was enough food to keep the refrigerator and freezer stocked so the hotel would not run out." (citations omitted)). Plaintiff also ordered food for the hotel banquets. *See* Elghourab Testimony at 484:2–19. The F&B department did not have a specific budget, and plaintiff simply ordered whatever was needed to keep the kitchen fully stocked. *See* Cristobal Testimony at 247:7–9, 247:19–249:1; Elghourab Testimony at 403:22–406:19, 431:7–8. Plaintiff was informed by the controller whether the food costs were high or low. *See* Elghourab Testimony at 407:1–7, 407:21–22 ("And then he say, this is the food cost. It is high, or it is down, there's nothing I can do."). Plaintiff was also responsible for taking inventory. *See id.* at 406:20–408:22. Plaintiff would count the food, and the controller would use the inventory list to manage the budget. *See id.*; *see also* Cristobal Testimony at 250:18–251:22. Alfonso Cristobal, defendant's controller who testified at trial, overlapped with plaintiff for only a couple of months. *See* Cristobal Testimony at 242:2–10, 247:16–18. During this time, he had one thirty-minute meeting with Elghourab, where they did a "quick count of the food inventory." *See id.* at 242:23–244:1, 261:17–262:1.

Although defendant claims that plaintiff had control over the restaurant's menu, the trial testimony makes clear that the menu changed rarely, if at all, during plaintiff's employment. *See* Pl.'s Br. 6–7 ("Plaintiff testified that the menu only changed when the Double Tree by Hilton changed to the Radisson JFK in 2013: the hotel logo was changed and a few of the more expensive items were removed; otherwise, it did not change. . . . Mr. Reyes testified that he cannot remember any changes to the menu during Plaintiff's employment. Mr. Borgella admitted that he has been cooking the same menu for years and that he doesn't remember the last time an item was added to the menu." (citations omitted)). While Miller testified that plaintiff was involved in setting menu prices, *see* Miller Testimony at 349:3–19, I find plaintiff's testimony that he was not involved in menu pricing more credible, *see* Elghourab Testimony at 408:23– 409:5. For down flight buffets and the employee lunch, the cooks on duty would determine what to make based on what was available in the freezer. *See* Reyes Testimony at 140:13–141:5, 178:17–179:4, 180:2–9; Borgella Testimony at 202:18–20.[14] Beginning in 2014, the hotel also had a "galley," i.e., a small space that sold sandwiches, salads, snacks, and drinks. *See, e.g.*, Reyes Testimony at 172:9–17; Elghourab Testimony at 427:20–428:15. Plaintiff would tell the cooks what sandwiches and salads to make for the galley. *See* Reyes Testimony at 172:15–22; Borgella Testimony at 236:20–237:3.

Plaintiff credibly testified that he was not responsible for preparing the kitchen for inspections when the hotel was a Double Tree because there was an F&B manager, and that the Radisson inspection did not include the F&B department. *See* Elghourab Testimony at 385:14

---

[14] Mr. Reyes and Mr. Borgella also testified that plaintiff would instruct them on what to make for the buffets and staff lunches. *See* Reyes Testimony at 156:4–13; Borgella Testimony at 195:1–17, 230:11–21. Because their trial testimony on this topic was vague and contradicted their deposition testimony, I do not rely on it. *See, e.g.*, Reyes Testimony at 156:10–11 ("[H]e was telling me you better send this, and send that, and do it this way or that way."); Borgella Testimony at 195:1–17 (contradicting his deposition testimony), 230:11–21 (testifying that plaintiff would tell him to "cook this, cook that").

387:12; *see also id.* at 451:6–8 (stating that he was not responsible for ensuring the quality of the food); Reyes Testimony at 176:5–177:10 (testifying that cooks are responsible for keeping their work areas clean).[15] To the extent that plaintiff was involved in preparing the kitchen for inspections, I conclude that his role was minimal.

When Pierre Merhej became the hotel's GM in 2014, he held weekly management meetings. *See* Elghourab Testimony at 416:15–417:4; *see also* Def.'s Trial Exs. G–FF ("Meeting Minutes"). When there was no F&B manager, plaintiff attended the weekly management meetings; however, he often had to leave after a few minutes to retrieve a food order or deal with a down flight. *See* Elghourab Testimony at 416:21–418:11; *see also* Pl.'s Trial Br. 38 (noting that "[t]he vast majority of minutes introduced at trial are from 2015," when Mr. Merhej was the GM and there was no F&B manager). When the hotel had a banquet, plaintiff would sometimes attend a brief planning meeting. *See* Elghourab Testimony at 483:12–484:15.

Plaintiff did not supervise the work of the F&B employees. *See* Elghourab Testimony at 383:17–22, 387:13–17, 423:20–424:15, 430:4–19; *see also* Berrones Testimony at 23:14–25:18 (testifying that the duties and responsibilities of the union employees are set by the union and do not change without union approval); Reyes Testimony at 131:22–132:5 (testifying that he prepares the employee lunch by himself); Borgella Testimony at 191:22–192:2 (same), 214:8–10 (testifying that he knows exactly what he is going to do when he comes in for the dinner shift). In fact, most of the F&B employees had been performing the same job duties since before

---

[15] Defendant's witnesses, on the other hand, testified in generalities regarding plaintiff's role preparing the kitchen for City and hotel inspections. *See* Berrones Testimony at 90:20–91:21 (testifying that it was plaintiff's responsibility to "make sure his department is in order to pass [the] inspection . . . [and that] the food and beverage department is up to date, it's clean, and the food is being prepared correctly"); Miller Testimony at 356:17–358:11 (testifying that plaintiff was responsible for "ensur[ing] that we have very few violations and discrepancies and that we're running a clean and safe kitchen"); Borgella Testimony at 229:16–230:5 ("My boss . . . [would] make sure that everything is okay for us to pass the inspection . . . [by] instruct[ing] us what to do . . . [m]ak[ing] sure that we keep our area clean, you know, mak[ing] sure everything is proper.").

plaintiff's employment. *See* Pl.'s Trial Br. 12; *see also* Reyes Testimony at 129:10–15 (testifying

that he has been doing the same thing every day at work for the past 18 years); Borgella

Testimony at 192:5–16 (testifying that his responsibilities regarding the employee lunch have

been the same for years). While Mr. Reyes and Mr. Borgella referred to Elghourab as "boss,"

"manager," and "supervisor" at trial, I agree with plaintiff that "they were unable to provide

specific details about the manner in which Plaintiff allegedly directed their work, speaking in . . .

generalities . . . . [and] chang[ing] the testimony that they had given at their depositions less than

two months prior." Pl.'s Trial Br. 22, 48 (citations omitted) (citing trial transcript); *see also*

*supra* nn.14–15. Plaintiff also never disciplined any F&B employees. *See* Elghourab Testimony

at 430:2–3; *see also* Berrones Testimony at 27:8–29:4 (testifying that union employees do not

get written reviews, that the Radisson JFK has a specific disciplinary procedure that requires

documentation, and that no documentation exists showing that plaintiff disciplined an

employee), 30:7-11 (testifying that she never observed plaintiff give a verbal warning to an F&B

employee); Reyes Testimony at 132:19–23 (stating that has never been disciplined by anyone at

the hotel); Borgella Testimony at 190:2–3 (testifying that he has not been disciplined in the past

10 years). At most, plaintiff discussed the quality of the food with his coworkers twice. *See* Pl.'s

Trial Br. 16 n.134 ("Plaintiff testified that there was one time during his employment where he

told a chef that he needed to make sure he followed the menu so that the food would be

consistent, and Mr. Reyes testified that there was one conversation amongst all the chefs about

the salt content of the food where Plaintiff said to 'use less salt.'" (citations omitted) (citing trial

record)); *see also id.* at 48.

     Plaintiff did not train the kitchen employees. They received no training beyond their first

few days of employment, if at all. *See* Berrones Testimony at 32:24–33:9 (acknowledging that

"there's very limited training that goes on . . . in the kitchen . . . because everyone knows their job duties"); Reyes Testimony 142:14–143:6 (agreeing that he has not been trained to cook anything in the past several years); Borgella Testimony at 186:23–187:4 (testifying that he believes he was trained for "one day or a couple of hours" when he was hired). While Mr. Reyes and Mr. Borgella testified that they were occasionally trained by plaintiff in new menu items and food presentation, I again agree with plaintiff that their testimony lacked credibility, as they testified in "vague generalities" and "neither could recall an instance of new dishes being added to the menu during Plaintiff's employment with any specificity and the restaurant did not serve the kind of menu where presentation is even a consideration." Pl.'s Trial Br. 16–17 (citations omitted) (citing trial transcript); *see also supra* p. 11.

Regarding scheduling, when there was no F&B manager, plaintiff was responsible for changing the date on the weekly schedule, highlighting the date, submitting it to management, and posting it on the wall. *See* Elghourab Testimony at 426:5–11, 443:13–444:1, 487:21–23; *see also* Berrones Testimony at 70:16–71:15. This task took two or three minutes. *See* Elghourab Testimony at 487:24–25. When an employee was out sick or on vacation, or a banquet required an additional cook, either plaintiff or someone from the Human Resources department would call the union employee with the most seniority to offer that employee overtime. *See id.* at 444:6–445:21; *see also* Berrones Testimony at 37:8–22, 70:16–71:15; Miller Testimony at 310:20–311:12. Further, when there was no F&B manager, plaintiff would sign off on employee vacation requests. *See* Elghourab Testimony at 413:21–415:13; *see also* Berrones Testimony at 71:16–72:4, 105:11–108:7; Def.'s Trial Ex. NN, ECF No. 63-28. Plaintiff never denied a vacation request. *See* Reyes Testimony at 145:6–11; Borgella Testimony at 211:10–18.

Union employees are required to punch in and out, and a record is automatically generated from their punches. *See* Berrones Testimony at 75:18–23. When there was no F&B manager, plaintiff would review the punch records, ensure that they were accurate, highlight any overtime worked for the week, and give the records to Human Resources. *See id.* at 75:11–76:18, 112:17–20; *see also* Elghourab Testimony at 411:13–412:16. This task took 10–15 minutes. *See* Elghourab Testimony at 412:2–3; *see also* Berrones Testimony at 111:22–112:3 (testifying that she met with plaintiff for 15 minutes weekly to go over payroll). Plaintiff would also create a "tip report" for accounting and Human Resources. *See* Berrones Testimony at 77:13–24. This simply involved inputting the tips on receipts into an Excel spreadsheet and took plaintiff 10 minutes. *See id.* at 112:4–16; Elghourab Testimony at 412:17–413:20.

It is undisputed that during plaintiff's employment, no union employees in the F&B department were fired and only a few were hired. When a union position did become available, Ms. Berrones would inform the union, and the union would send candidates to the hotel. *See* Berrones Testimony at 49:7–21. Ahmed Zakaria was hired as a busser during plaintiff's employment. While Ms. Berrones testified to the contrary, *see* Berrones Testimony at 97:2–5, I credit plaintiff's testimony that he played no role in hiring him, *see* Elghourab Testimony at 422:12–423:19, 428:17–20, 429:7–8; *see also* Berrones Testimony at 113:4–25. Defendant also claims that plaintiff was responsible for hiring Jaiwante Singh as a dishwasher and Mohamad Hizam as a substitute cook. *See* Def.'s Trial Br. 31–32 (citing trial transcript). I again credit plaintiff's version of events, which is that he simply escorted these individuals to Human Resources where they were hired. *See* Elghourab Testimony at 418:14–421:8, 424:19–425:18, 438:2–439:7. To the extent that plaintiff asked these individuals questions, it was not with the

intention of evaluating their credentials or weighing in on the hiring decision. *See id.* 438:2–439:7.[16]

There is an office next to the kitchen that plaintiff shared with the F&B manager. *See* Elghourab Testimony at 488:3–10, 489:4–19. Plaintiff admittedly used this office to change his clothes and rest, as well as to perform limited managerial tasks. *See id.* at 489:4–19. Overall, however, when there was no F&B manager, plaintiff spent 90% of his time working in the kitchen and 10% of his time managing; when there was an F&B manager, plaintiff spent nearly all of his time working in the kitchen. *See id.* at 487:6–17.

## II.   Conclusions of Law

### A.  Executive Exemption

#### i.  FLSA and Its Exemptions

Under the FLSA, employers are required to pay employees overtime compensation for all time worked in excess of 40 hours per week, unless the employee falls under an enumerated exemption. 29 U.S.C. § 207(a)(1).[17] Because the FLSA is a remedial act, its exemptions are to be narrowly construed, and the employer bears the burden of demonstrating that an employee falls under a specific exemption. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (citing *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991)); *Carhuapoma,* 2013 WL 1285295, at *6 (citing *Martin*, 949 F.2d at 614).

---

[16] Both parties agree that plaintiff played no role in the hiring of Jose Fernandez and Carmen Diaz. Mr. Fernandez was employed by the hotel in the F&B department when a full-time dishwasher position became available, and he was given the position based on seniority. *See* Berrones Testimony at 47:23–48:20. Ms. Diaz was hired as a bartender by Mr. Miller. *See id.* at 64:19-65:11.

[17] The NYLL also mandates overtime pay and contains the same exemptions as the FLSA. The Second Circuit thus engages in a single analysis under the FLSA to resolve both FLSA and NYLL claims, and I will do the same here. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 78 (2d Cir. 2003); *Awan v. Durrani*, No. 14-cv-4562 (SIL), 2015 WL 4000139, at *9–10 (E.D.N.Y. July 1, 2015); *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 519 (S.D.N.Y. 2013).

## ii.   The Executive Exemption

The FLSA exemptions include "any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). The FLSA does not define what it means to work in an "executive capacity" but "instead directs the Secretary of Labor to 'define[] and delimit[]'" that term through regulations. *Ramos*, 687 F.3d at 559 (alterations in original) (citing § 213(a)(1)); *see also Tamayo v. DHR Rest. Co.*, No. 14 Civ. 9633 (GBD), 2017 WL 532460, at *5 (S.D.N.Y. Feb. 3, 2017) (citing *Ramos*, 687 F.3d at 559). The Department of Labor ("the DOL") has defined "employee employed in a bona fide executive capacity" to mean any employee who is:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2016). The question of whether an employee falls under the executive exemption is a mixed question of fact and law—i.e., how the employee spent his time working is a question of fact, while whether the employee's activities exclude him from overtime benefits is a question of law. *See Ramos*, 687 F.3d at 558 (first citing *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010); then citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)); *Tamayo*, 2017 WL 532460, at *5 (citing *Ramos*, 687 F.3d at 558); *Carhuapoma,* 2013 WL 1285295, at *7 (first citing *Myers*, 624 F.3d at 548; then citing *Icicle Seafoods*, 475 U.S. at 714). The parties agree that element (1) is satisfied, but they disagree over elements (2), (3), and (4). I address each element in turn.

17

### 1. Primary Duty of Management

The DOL regulations define "management" to include a range of activities, such as:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The DOL regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The regulations provide the following list of nonexclusive factors to be considered in determining whether an employee's primary duty is management: (1) the amount of time spent on exempt versus nonexempt work; (2) "the employee's relative freedom from direct supervision"; (3) "the relative importance of the [employee's] exempt duties as compared with other types of duties"; and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

### a. Amount of Time Spent on Exempt Work

The amount of time an employee spends performing exempt work "can be a useful guide in determining whether exempt work is the primary duty of an employee." § 541.700(b). "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," *id.*, but employees who spend less than 50 percent of their time on exempt work may still fall under the executive exemption if other factors

support such a conclusion. *See Tamayo*, 2017 WL 532460, at *6 (citing § 541.700(b));

*Carhuapoma,* 2013 WL 1285295, at *9–10 (noting that exempt executives tend to have

discretion over when they perform nonexempt duties and the ability to perform managerial and

nonmanagerial duties concurrently). Courts in the Second Circuit have determined "that a chef's

'primary duty' is not management where his duties primarily entail cooking." *Karropoulos v.*

*Soup du Jour, Ltd.*, 128 F. Supp. 3d 518, 530 (E.D.N.Y. 2015) (citing *Solis v. SCA Rest. Corp.*,

938 F. Supp. 2d 380, 396 (E.D.N.Y. 2013)).

 Here, plaintiff spent a significant portion of his day preparing and cooking food, and at

least 90% of his time was consumed by nonexempt work. While this breakdown is not

dispositive, it strongly suggests that plaintiff's primary duty was not management. Further, the

hectic nature of the hotel restaurant left plaintiff with very little discretion over when to perform

nonexempt duties; as discussed *supra*, plaintiff was constantly jumping in to prepare and serve

food for down flights and banquets, clean the kitchen, wash the dishes, take out the trash, and

assist with manual labor on an as needed basis. Thus, this factor weighs heavily in favor of

plaintiff being a nonexempt employee.

### b.  Relative Freedom from Supervision

 An employee who is free from supervision is more likely to be a manager. While

Elghourab admits that he performed some managerial tasks, particularly when there was no F&B

manager, "[e]mployees may not be exempt, even if they perform managerial tasks, if they 'd[o]

so largely pursuant to the dictates of immutable corporate policy or at the behest of the . . .

Manager to whom [they] report[ ].'" *Carhuapoma,* 2013 WL 1285295, at *10 (alterations in

original) (quoting *Clougher v. Home Depot U.S.A., Inc.*, 696 F.Supp.2d 285, 288

(E.D.N.Y.2010)). However, "an employee can be exempt even if his discretion is

'circumscribed' by a guidebook or supervisor, as long as, despite the circumscription, 'judgments must still be made' by that employee." *Id.* at *10 (quoting *Donovan v. Burger King Corp.*, 675 F.2d 516, 521–22 (2d Cir. 1982)).

Because the CBA and MOU controlled the union employees' job duties, hours, vacations, salaries, and overtime opportunities, even when plaintiff was performing managerial tasks, he was doing so "largely pursuant to the dictates of immutable . . . policy," *Carhuapoma,* 2013 WL 1285295, at *10, and was making virtually no judgments. Throughout most of plaintiff's employment, he reported to the F&B manager, who handled the managerial duties but occasionally directed plaintiff to assist. *See, e.g.*, Elghourab Testimony at 487:21–488:1 (testifying that he was not responsible for scheduling kitchen staff when an F&B manager was employed but that if the F&B manager asked him to prepare the schedule, he would "do the date and put it there," a task that took "two, three minutes"). In addition, as plaintiff notes, because the union members' job duties were pre-established, "[p]laintifff . . . was literally the only person that could be assigned to perform . . . additional duties either by a F&B [m]anager or in the absence of one." Pl.'s Br. 42. Plaintiff was thus not free from supervision, weighing against a finding that he was a manager.

### c.  Relative Importance of Exempt Duties

In determining whether an employee's managerial duties were more important to the defendant than the employee's nonmanagerial duties, courts in the Second Circuit have looked at whether the business could operate successfully without the employee performing the purported managerial functions. *See, e.g.*, *Tamayo*, 2017 WL 532460, at *6. In the context of a restaurant, "[t]he relative importance inquiry evaluates whether the restaurant[] could not operate successfully unless the purported managerial functions assigned to [the] Head Chef, such as

20

determining amounts of food to be prepared, keeping track of inventory, and assigning employees to particular jobs, were performed." *Id.* If, however, "other employees could have also performed some of [the Head Chef's] supervisory duties, . . . those duties [are] less important." *Id.* at *9; *see also* 29 C.F.R. § 541.106(c) ("[A] working supervisor whose primary duty is performing nonexempt work . . . does not become exempt merely because the nonexempt . . . employee occasionally has some responsibility for directing the work of other nonexempt . . . employees when, for example, the exempt supervisor is unavailable.").

Most of plaintiff's managerial responsibilities—i.e., scheduling, signing off on vacation requests, and preparing payroll and tip reports—were handled by the F&B manager when one was employed. Thus, plaintiff resembles a nonexempt "working supervisor" who had "some [management] responsibility" when "the exempt supervisor [was] unavailable." 29 C.F.R. § 541.106(c). Further, most of the F&B employees had been performing the same job duties for years, rendering plaintiff's role in the successful operation of the hotel restaurant less important. However, Elghourab was indisputably responsible for ordering food and counting inventory, tasks that, while simple, were of obvious importance to the restaurant's operations. Overall, I find that this factor weighs neither in favor nor against plaintiff's primary duty being management.

### d.  Plaintiff's Salary vs. Salary of Nonexempt Employees

If an employee makes more money than nonexempt employees, he is more likely to be a manager. When comparing a plaintiff's salary to the salaries of nonexempt employees, courts often reduce the allegedly exempt employee's weekly salary to an hourly rate of pay based on the actual number of hours worked. *See, e.g.*, *Tamayo*, 2017 WL 532460, at *9; *Carhuapoma*, 2013 WL 1285295, at *12; *Clougher*, 696 F. Supp. 2d at 293. With the exception of the end of

2016, plaintiff was working 67.5–98 hours per week and making $10.79–$15.67 per hour; his nonexempt coworkers, on the other hand, were earning hourly wages between $22 and $27. *See supra* pp. 6–8. Thus, plaintiff was paid a significantly lower hourly rate than his coworkers, weighing against a finding that his primary duty was management.

### e.  Conclusion

Based on the evidence before me, I find that plaintiff's primary duty was to work alongside his union colleagues performing nonexempt tasks. He did not participate in the vast majority of the DOL-defined management activities, such as managing employees (discussed *infra*), hiring and firing employees (discussed *infra*), "setting and adjusting . . . rates of pay and hours of work," "handling employee complaints and grievances," "controlling the budget," and "monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102. The management responsibilities he did perform were both limited and straightforward. Accordingly, I conclude that plaintiff's primary duty was not management.[18]

### 2.  Directing the Work of Two or More Employees

Element three of the executive-exemption test requires the exempt employee to "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). According to the DOL, "[t]he phrase 'customarily and regularly' means greater than occasional but less than constant; it includes work normally done every workweek, but does not include isolated or one-time tasks."[19] As discussed *supra*, plaintiff did not regularly direct the work of the F&B employees. He did not train them or tell them their duties with respect to food

---

[18] Further, I note that even if plaintiff performed his management responsibilities at all times—and not simply when there was no F&B manager present—defendant would still fall short of demonstrating that plaintiff's primary duty was management.

[19] U.S. Dep't of Labor, *Fact Sheet #17B: Exemption for Executive Employees Under the Fair Labor Standards Act (FLSA)* (July 2008), https://www.dol.gov/whd/overtime/fs17b_executive.pdf.

preparation or restaurant operations. Their duties are controlled by the CBA and MOU, and most of the employees had been performing the same daily tasks since before plaintiff started working at the restaurant. The a la carte menu was unchanging, the chefs generally worked alone when preparing the employee lunches, and the chefs decided what to make for the down flight buffets based on what was available in the freezer. At most, plaintiff disciplined his coworkers two times during his five years of employment. The evidence adduced at trial suggests that plaintiff was more of a peer than a boss, and accordingly, this factor weighs against plaintiff falling under the executive exemption.

### 3.   Recommendations Given Particular Weight

An exempt executive must have "the authority to hire or fire other employees," or the executive's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees" must be "given particular weight." 29 C.F.R. § 541.100(a)(4). In determining whether an employee's recommendations carry "particular weight," courts are to consider whether the recommendations are part of the employee's job duties, and the frequency with which such recommendations are made and relied upon. § 541.105; *see also id.* (noting that an "occasional suggestion" is insufficient to meet the "particular weight" requirement). "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.* As detailed earlier, no F&B employee was fired or demoted during plaintiff's employment, and plaintiff's role in the hiring process was limited to escorting two individuals to Human Resources. The hiring process was heavily controlled by the CBA, and to the extent that decisions needed to be made, they were made by Human Resources

or the hotel's GM. *See, e.g.*, Elghourab Testimony at 418:19–420:7; Berrones Testimony at 64:17-65:11. Thus, this factor weighs in favor of plaintiff being a nonexempt employee.

### iii.  Conclusion

In sum, while plaintiff did make more than $455 per week, his primary duty was not management, he did not customarily and regularly direct the work of two or more employees, and he did not participate in the hiring, firing, advancement, and promotion of employees. *See* 29 C.F.R. § 541.100(a). Accordingly, plaintiff does not qualify as an exempt executive.

## B.  Damages

As detailed below, I agree with plaintiff's damages calculation in its entirety. *See* Pl.'s Trial Br. 51–57; Pl.'s Trial Br. Ex. 27, ECF No. 63-29 ("Pl.'s Damages Calculation").

### i.  Overtime

Under both the FLSA and the NYLL, "once an employee works 40 hours in a week, he must be paid 'one and one-half times [his] regular rate' for all excess hours." *Martinez v. Dannys Athens Diner, Inc.*, No. 16-cv-7468 (RJS), 2017 WL 6335908, at *2 (S.D.N.Y. Dec. 5, 2017) (alteration in original) (quoting *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 88 (2d Cir. 2013)), *appeal docketed*, No. 18-80 (2d Cir. Jan. 10, 2018). A plaintiff "is not entitled to recover cumulative damages for unpaid wages under both federal and state law." *Llolla v. Karen Gardens Apartment Corp.*, No. 12-CV-1356 (MKB)(JO), 2014 WL 1310311, at *11 (E.D.N.Y. Mar. 10, 2014), *adopted in relevant part by* 2014 WL 1311773 (E.D.N.Y. Mar. 28, 2014). Instead, a plaintiff "may recover under the statute which provides the greatest amount of damages." *Jiao v. Chen*, No. 03 Civ. 0165(DF), 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007). In this case, Elghourab is seeking recovery under the NYLL because it affords him the

24

greatest relief. Thus, I need only calculate plaintiff's damages under the NYLL. *See Jiao*, 2007 WL 4944767, at *17.

Under the NYLL, "[i]f an employer fails to pay an employee an hourly rate of pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings . . . by the lesser of 40 hours or the actual number of hours worked by that employee during the work week." 12 N.Y.C.R.R. § 146-3.5(b); *see also Martinez*, 2017 WL 6335908, at *4 (S.D.N.Y. Dec. 5, 2017); *Romero v. Rung Charoen Sub, Inc.*, No. 16 Civ. 1239 (VMS), 2017 WL 4480758, at *10 (E.D.N.Y. Sept. 30, 2017). Accordingly, plaintiff correctly calculated his regular rate of pay based on a 40-hour work week, not the actual number of hours he worked. *See* Pl.'s Damages Calculation. Using the NYLL's hourly rate and six-year statute of limitations period (*see* N.Y. Lab. Law §§ 198(3), 663(3)), plaintiff is owed overtime compensation in the amount of $420,248.36.

### ii.  Liquidated Damages

Under the FLSA, a plaintiff is presumptively entitled to "liquidated damages equal in amount to actual damages," unless "the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (quoting 29 U.S.C. § 260). "'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA, and then move to comply with them." *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997). As a result, the employer's "burden is a difficult one, with double damages being the norm and single damages the exception." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d

Cir. 1999). Similarly to the FLSA, the NYLL allows plaintiffs to recover "liquidated damages equal to one hundred percent of the total . . . underpayments found to be due" "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Lab. Law § 663(1). Although this text "is not identical to that of the FLSA . . . , courts have not substantively distinguished the federal standard from the current state standard of good faith." *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015).[20]

Here, defendants have failed to demonstrate that their failure to pay plaintiff overtime wages was in good faith or that they took any "active steps" to comply with the law. Plaintiff was labeled as an exempt executive not based on his actual duties and responsibilities but because it was industry custom. *See* Miller Testimony at 289:7–24, 292:3–293:4, 294:8–294:20; *see also* Pl.'s Trial Br. 19, 54; Def.'s Reply 19, ECF No. 66. Ms. Berrones admitted that she has not done any research or taken any classes on the FLSA or the NYLL, and that she never analyzed whether Elghourab's position was exempt or not. *See* Berrones Testimony at 18:21–19:14. As the trial testimony makes clear, if defendant had taken the time to evaluate whether plaintiff was exempt under federal or state wage laws, it would have determined he was not. Accordingly, plaintiff is entitled to $420,248.36 in liquidated damages.

### iii. Statutory Penalties

The NYLL also imposes certain notice requirements on employers. One such requirement is that each employer "provide his or her employees . . . , at the time of hiring, a notice containing" certain information, including the employee's "rate or rates of pay and basis thereof." N.Y. Lab. Law § 195(1)(a). On and after February 27, 2015, the NYLL entitles a

---

[20] "For unpaid wages incurred on or after April 9, 2011, a plaintiff is not permitted a cumulative recovery, but rather, may recover 'under the statute that provides the greatest relief.'" Pl's Br. 54 (citing *Castillo v. RV Transp., Inc.*, No. 15 Civ. 0527 (LGS), 2016 WL 1417848, at *3 (S.D.N.Y. Apr. 11, 2016)).

plaintiff to $50 for each workday that a wage-notice violation occurs, not to exceed $5,000. *See id.* § 198(1–b); *see also Chen v. New Fresco Tortillas Taco LLC*, No. 15 Civ. 2158 (RA)(AJP), 2015 WL 5710320, at *8 (S.D.N.Y. Sept. 25, 2015). In this case, it is uncontested that defendant never provided plaintiff with a wage notice. As I noted in my opinion denying defendant's motion for summary judgment, plaintiff's wage-notice-violation claim turns on his exempt status. *See Elghourab v. Vista JFK, LLC*, No. 17-cv-911 (ARR) (ST), 2018 WL 6182491, at *10 (E.D.N.Y. Nov. 27, 2018). Because I determine that plaintiff is nonexempt, he is entitled to the statutory maximum of $5,000 for defendant's failure to provide wage notices.

### iv.  Interest

The NYLL, unlike the FLSA, permits the award of both liquidated damages and prejudgment interest. *Khurana v. JMP USA, Inc.*, No. 14-CV-4448 (SIL), 2017 WL 1251102, at *17 (E.D.N.Y. Apr. 5, 2017); *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 48 (E.D.N.Y. 2015). Under New York law, a prevailing employee is entitled to prejudgment interest at a rate of 9% per year for a NYLL claim. *See* N.Y. C.P.L.R. 5001, 5004. While courts have discretion in determining a reasonable date from which to award prejudgment interest, "[a] single reasonable intermediate date is the median date between the earliest and latest each Plaintiffs' NYLL claim accrued." *Hernandez v. NJK Contractors, Inc.*, No. 09-CV-4812 (RER), 2015 WL 1966355, at *51 (E.D.N.Y. May 1, 2015); *see also Khurana*, 2017 WL 1251102, at *17; *Coulibaly v. Millennium Super Car Wash, Inc.*, No. 12-CV-4760 (CBA)(CLP), 2013 WL 6021668, at *15 (E.D.N.Y. Nov. 13, 2013). Accordingly, I award plaintiff prejudgment interest of 9% per year from a midpoint date of March 10, 2014 until judgment is entered. Plaintiff is also awarded post-judgment interest at the statutory rate prescribed by 28 U.S.C. § 1961. *See Coulibaly*, 2013 WL 6021668, at *16.

## III.    Conclusion

As set forth in this opinion, I find that plaintiff does not fall under the executive exemption and that defendant is therefore liable for violations of the FLSA and the NYLL. Plaintiff is entitled to the following relief: (1) $420,248.36 in unpaid overtime compensation; (2) $420,248.36 in liquidated damages; (3) $5,000 in statutory wage notice damages; and (4) pre- and post-judgment interest. Plaintiff is also entitled to a 15% increase in the damages owed to him "if any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later." N.Y. Lab. Law §§ 198(4), 663(4); *see also Martinez*, 2017 WL 6335908, at *6. Under the FLSA and the NYLL, a prevailing plaintiff is entitled to reasonable attorneys' fees and costs. *See* 29 U.S.C. § 216(b); N.Y. Lab. Law § 663(1). Accordingly, plaintiff's request to make a motion for attorneys' fees, costs, and disbursements is granted. This motion is respectfully referred to Magistrate Judge Tiscione.

SO ORDERED.


_____/s/_____
Allyne R. Ross
United States District Judge

Dated:      June 11, 2019
            Brooklyn, New York

28